## WINTERWERP *v.* ALLSTATE INSURANCE COMPANY

[No. 152, September Term, 1975.]

*Decided May 21, 1976.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ., and reargued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ., and JERROLD V. POWERS, Associate Judge of the Court of Special Appeals, specially assigned.

Argued and reargued by *Karl G. Feissner* and *Ronald S. Schimel*, with whom were *Feissner, Garrity, Levan & Schimel* on the brief, for appellant.

Argued and reargued by *James T. Wharton*, with whom were *McCarthy & Wharton* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court. SMITH, DIGGES and ELDRIDGE, JJ., dissent and SMITH, J., filed a dissenting opinion in which DIGGES and ELDRIDGE, JJ., concur at page 722 *infra*.

This appeal is from a decision of the Circuit Court for Prince George's County (Mathias, J.) in a declaratory judgment action brought by appellant, Carl J. Winterwerp (the insured), against appellee, Allstate Insurance Company (Allstate), the insurer. The court declared that the policy issued by Allstate did not cover the insured, a volunteer fireman, in connection with his operation of a vehicle owned by Baden Volunteer Fire Department (Baden). From that decision, the insured appealed and we granted certiorari prior to a consideration of the case by the Court of Special Appeals. We affirm.

On July 10, 1973, a Ford open-body truck called a "brush wagon," owned by Baden, was involved in an accident while being operated by the insured in response to an emergency call. The truck, which was capable of carrying ten persons, bore a two-ton weight designation, had an empty gross vehicle weight of 14,209 pounds, a maximum gross vehicle weight of 21,000 pounds, 6 wheels and an overall length of 21 feet. It was painted the traditional red and included such firefighting equipment as a 300 gallon-per-minute pump

with 150 linear feet of 1½ inch hose and two 100 foot booster reels of hose, plus the usual trappings identifying it as an emergency vehicle. Baden owned six emergency vehicles in all, including the brush wagon, two class A pumpers, a tanker, an ambulance, and a jeep, which were used in varying combinations depending on the nature and extent of the particular emergency to which they were responding. It also owned a utility truck.

The insured was one of 10 to 12 volunteers who were certified as drivers of the Baden vehicles, a status he had achieved only after a period of training conducted by his superiors. He was, in addition, in possession of a class B Maryland operator's license permitting him to drive vehicles over 20,000 pounds. The driver assignments to the various vehicles being employed on a specific occasion were governed by the order in which the certified drivers choosing to respond to a particular emergency arrived at the station. Baden's records disclosed that during the two-year period preceding the accident the insured had driven one or another of its vehicles on 70 emergency "runs," and on 10 of these occasions he had driven the "brush truck." During the same period, approximately 2,000 emergency trips had been made in the six vehicles.

As a consequence of the July 10 accident, another volunteer member of the company made a personal injury claim against the insured. It was some months later that the insured turned to Allstate after learning that the company insuring the Baden vehicles would not extend coverage to him, apparently because its insurance policy excluded claims made by fellow volunteers. At the time of the accident, there was in effect an Allstate policy covering three vehicles owned by the insured: an automobile, a camping trailer and a pick-up truck.

Allstate disclaimed liability under the policy primarily on the grounds that the fire truck was neither specifically covered in the policy, nor was it a "non-owned automobile" to which coverage was extended, defined in the policy as "an automobile, including a trailer, not owned by, or *furnished or available for the regular use of,* the named insured or any

resident of his household other than a temporary substitute automobile, provided the use thereof is with the permission of the owner." (emphasis added). In ruling that the Allstate policy did not cover the insured for the accident in question, the trial judge agreed that the fire truck was "furnished or available for the regular use of, the named insured," a conclusion in which we concur. He further ruled that the truck did not meet the policy definition of an "automobile," "a land motor vehicle designed for use principally upon public roads," posing an issue which we find unnecessary to reach.

In urging reversal, the insured initially contends that the definition of a "non-owned automobile" is ambiguous and, therefore, should be "construed most narrowly" against Allstate. He places sole reliance for this contention on *Ricci v. United States Fidelity and Guaranty Co.*, 110 R. I. 68, 290 A. 2d 408, 413 (1972), where the court held that the words "furnished for the regular use of . . . the Named Insured" in a policy were ambiguous, and therefore construed the policy strictly against the insurance company which had issued it. In doing so, it upheld an interpretation of the lower court which ruled that the insured was afforded coverage under the policy.

That decision of the Rhode Island court is at variance with our holding in *Allstate v. Humphrey*, 246 Md. 492, 496, 229 A. 2d 70 (1967), where the policy provision in dispute, containing the clause " 'not regularly furnished for use of such relative,' " was found to be unambiguous. We noted there that absent an ambiguity, Maryland has not adopted the rule followed in many jurisdictions that an insurance policy is to be most strongly construed against the insurer. *See also Ebert v. Millers Fire Ins. Co.*, 220 Md. 602, 611, 155 A. 2d 484 (1959). In *Humphrey*, we also applied the rule that where the facts pertinent to the question of coverage are undisputed, the issue is one of construction in light of the language employed in the contract, the subject matter and the surrounding circumstances.

Here, then, since the facts are undisputed, construction of the clause presents a question of law for the court. Further

we are not persuaded that the disputed language is ambiguous, since we find the clause neither uncertain in its general meaning nor subject to construction in alternate ways. *Allstate v. Humphrey, supra; Coombs v. Lumbermen's Mutual Casualty Company,* 23 Ariz. App. 207, 531 P. 2d 1145, 1147 (1975); *Bringle v. Economy Fire & Casualty Company,* 169 N.W.2d 879, 883 (Iowa 1969); *Kenney v. Employers' Liability Assurance Corp.,* 5 Ohio St. 2d 131, 214 N.E.2d 219, 221 (1966); *Quesenberry v. Nichols,* 208 Va. 667, 159 S.E.2d 636, 641 (1968); *contra, Dairyland Insurance Company v. Ward,* 83 Wash. 2d 353, 517 P. 2d 966, 969 (1974). As Judge Oppenheimer aptly stated for the Court in *Humphrey,* the fact "[t]hat a term cannot be precisely defined so as to make clear its application in all varying factual situations does not mean that it is ambiguous." In light of our conclusion that the language in controversy is not ambiguous, there is no basis for construing it strictly against the insurer.

The cases in which other courts have construed the words "furnished or available for the regular use of the insured," or similar language, are numerous indeed. The view which we share with many of those courts, and which we expressed in *Allstate v. Humphrey, supra,* 246 Md. at 499, is that no hard and fast rule has been or can be established for resolving the issue. Each case must, in the final analysis, stand or fall upon its own facts. Virtually all courts which have expressed themselves upon the matter agree on the purpose of the clause involved here. No statement we have found regarding this purpose appears to have been more widely quoted or cited than that of Judge Chesnut in *Aler v. Travelers Indemnity Co.,* 92 F. Supp. 620, 623 (D. Md. 1950), where, confronted with the words "furnished for regular use to the named insured," he said:

"... The general purpose and effect of this provision of the policy is to give coverage to the insured while engaged in the only infrequent or merely casual use of an automobile other than the one described in the policy, but not to cover him

against personal liability with respect to his use of another automobile which he frequently uses or has the *opportunity* to do so." (emphasis added).

In construing the word "regular," as used in the "drive other automobile clause," most courts, as we did in *Allstate v. Humphrey, supra*, 246 Md. at 497, have given that term its plain and ordinary meaning. In *Humphrey*, we suggested that the word "regular" was the antonym of "casual" or "occasional"; and meant " 'steady or uniform in course, practice or occurrence; . . . steadily pursued; . . . functioning at proper intervals; . . . recurring . . . at stated, fixed, or uniform intervals.' " The insured argues that his use of the Baden equipment was not "regular," since he had driven the "brush wagon" only ten times in the two-year period preceding the accident. Furthermore, he contends that whether he drove the equipment was a matter of "chance" because it depended on whether he responded to an alarm and, if so, whether he was among the certified drivers who arrived in time to operate any of the equipment required in that instance. In our view, this argument begs the question.

We consider the question in light of the evidence that, while the insured had driven the "brush wagon" only ten times within a two-year period, he had operated one of the six vehicles employed in emergencies on 70 trips during that same period. It is a well-settled proposition that an automobile will be excluded under a "drive other automobile" clause even though it is only one of a group of vehicles furnished or made available for the regular use of the named insured. *Farm Bureau Mutual Automobile Ins. Co. v. Marr*, 128 F. Supp. 67, 69 (D. N.J. 1955); *Bringle v. Economy Fire & Casualty Company, supra*, 169 N.W.2d at 883; *Ruggiero v. Globe Indemnity Company*, 66 Misc. 2d 948, 323 N.Y.S.2d 292 (1971); *Kenney v. Employers' Liability Assurance Corp., supra*, 214 N.E.2d at 221; *see Kern v. Liberty Mutual Insurance Company*, 398 F. 2d 958, 961-62 (8th Cir. 1968); *Commercial Insurance Co. of Newark, N.J. v. Gardner*, 233 F. Supp. 884, 886 (E.D. S.C. 1964).

As we intimated earlier, there are innumerable cases

addressing the question which confronts us here, and the factual situations considered in them are myriad. This much, however, does seem clear. The period and frequency of the permitted use, as we held in *Allstate v. Humphrey, supra,* 246 Md. at 498, "are elements to be considered in the determination of whether, on the facts, there was coverage under the policy." Some courts, as we also noted in *Humphrey,* have held that coverage is afforded in instances of casual and occasional use of another car for which special permission must be obtained whenever it is driven. *Kern v. Liberty Mutual Insurance Company, supra,* 398 F. 2d at 963; *Farm Bureau Mutual Automobile Ins. Co. v. Marr, supra,* 128 F. Supp. at 70; *Waggoner v. Wilson,* 31 Colo. App. 518, 507 P. 2d 482, 485 (1972). Yet another factor considered in a few cases, particularly where the insured driver operates a vehicle owned by his employer, was whether such driving is among the employee's duties. *Kern v. Liberty Mutual Insurance Company, supra,* 398 F. 2d at 963; *Brouillette v. Fireman's Fund Insurance Company,* 163 So. 2d 389, 392 (La. App. 1964); *see Farm Bureau Mutual Automobile Ins. Co. v. Marr, supra,* 128 F. Supp. at 71; *Bringle v. Economy Fire & Casualty Company, supra,* 169 N.W.2d at 882.

Were we limited to the criteria just enumerated, we might well regard this as a close case, but would nevertheless conclude that coverage is excluded. Here, there was nothing temporary or limited about the insured's connection with the firefighting vehicles. He had steadily and continuously participated as a Baden volunteer for two years and, prior to a seven-year respite, had been previously associated with the fire company in the same capacity for six years. Moreover, it was not only unnecessary for the insured to seek permission to drive one of the vehicles required in a particular instance, but it was his duty to perform that task whenever he arrived in time to do so. And since he lived only 1.2 miles from the firehouse and had a monitor in his home, it is quite likely that he would be among the early arrivals whenever he chose to respond. Therefore, the fact that the insured drove the equipment on only 70 out of the 2,000 trips made over the two-year span is not decisive here. What does matter is

that he did drive on the 70 occasions, an experience rate which we think can be fairly described as steady or uniform in course, practice or occurrence. *Allstate v. Humphrey, supra,* 246 Md. at 497.

As we have indicated, few of the cases dealing with this subject are alike, but two in particular seem apposite here: *Voelker v. Travelers Indemnity Company,* 172 F. Supp. 306 (N.D. Ill. 1958), *aff'd,* 260 F. 2d 275 (7th Cir. 1958) and *Farm Bureau Mutual Automobile Ins. Co. v. Marr, supra.* In *Voelker,* the court excluded coverage for a member of the national guard who was involved in a collision while driving a military vehicle on duty and returning from two weeks' summer encampment, despite the fact that he had used it on only two occasions during that period of duty. In *Marr,* the same result was reached where a customs agent had driven any one of several automobiles, maintained as part of a motor pool, approximately 50 times in a ten-month period. The difference between those two cases and the instant case is only in the number of trips actually made. We are unwilling to adopt a rule which compels both the insured and the insurer to speculate in advance of an accident whether the line separating coverage and exclusion is being crossed.

An additional factor presented here, not found in many of the reported cases, is the inclusion of the word "available" in the disputed clause. "The terms 'available' and 'furnished' are not synonymous." *Waggoner v. Wilson, supra,* 507 P. 2d at 485. In short, it is not alone the actual use, but also the opportunity for use that is contemplated by the exclusionary language. Here, the six vehicles were at all times available for use by the insured in conformity with his prescribed duties.

We hold that the firefighting vehicles were furnished or available for the regular use of the insured and that their use by the insured was, therefore, excluded from coverage.

*Judgment affirmed; appellant to pay costs.*

*Smith, J., dissenting:*

I respectfully dissent.

The majority quotes from Judge Chesnut's opinion in *Aler v. Travelers Indemnity Co.*, 92 F. Supp. 620 (D. Md. 1950), as to the purpose of the clause here under consideration. They would have done well to have quoted the remainder of the quoted paragraph which stated:

> "More specifically the evident intention of the limitation with respect to other automobiles is to prevent a situation in which the members of one family or household may have two or more automobiles actually or potentially used interchangeably but with only one particular automobile insured. That this is the general purpose of the provision is well and clearly stated in the annotation on the subject in 173 A.L.R. 901. And see Lumbermens Mutual Cas. Company v. Pulsifer, D.C. Me., 41 F.Supp. 249; Rodenkirk v. State Farm Mut. Auto Ins. Co., 325 Ill. App. 421, 60 N.E.2d 269." *Id.* at 623.

This interpretation has been widely accepted. *See, e.g.,* Couch on Insurance 2d § 45:1052 (1965); *Pennsylvania T. & F. Mut. Cas. Ins. Co. v. Robertson*, 259 F. 2d 389, 393 (4th Cir. 1958), *cert. denied,* 395 U. S. 950 (1959); *Continental Casualty Company v. Suttenfield*, 236 F. 2d 433, 437 (5th Cir. 1956); *Campbell v. Aetna Casualty and Surety Co.*, 211 F. 2d 732, 736 (4th Cir. 1954), (Judge Soper said for the court, "The great weight of authority is in accord with the interpretation of this provision by Judge Chesnut . . . ," which he then quoted.); and *Boedigheimer v. Taylor*, 287 Minn. 323, 328, 178 N.W.2d 610 (1970).

In *Rodenkirk v. State Farm Mut. Automobile Ins. Co.*, 325 Ill. App. 421, 60 N.E.2d 269 (App. Ct. Ill., 1st D., 3d Div. 1945), quoted by Judge Chesnut in *Aler*, the court said:

> "The exclusion from coverage of other cars owned by the insured as well as cars owned by the members of his household, and the exclusion of cars

furnished for regular use to the insured or a member of his household would seem to indicate the intention of the company to protect itself from a situation where an insured could pay for one policy and be covered by the insurance in driving any car that he decided to use whether owned by him or members of his family, or cars that had been furnished for his *regular use; in other words, cars under his control that he could use at will and might use often."* Id. 274 of 60 N.E.2d (Emphasis added.)

The majority also might well have given further consideration to what was said by our predecessors in *Allstate v. Humphrey,* 246 Md. 492, 229 A. 2d 70 (1967), from which they quoted. There coverage was afforded the driver of the vehicle as a member of the household of his father-in-law, the named insured. The driver had been living in Baltimore with his in-laws since September 4, 1964. The accident took place on October 1, 1964. On September 28 he had visited his brother in West Virginia at which time his own car broke down. He was advised that repairs would take about three days. It being necessary for him to return to work immediately, he advised his brother of his difficulty. The brother then gave him permission to drive a vehicle which was to be returned in about two weeks. The accident occurred four days after he had borrowed the brother's car while he was driving that car to work from the residence of his father-in-law. Judge Oppenheimer said that no restrictions had been imposed upon the use of the loaned vehicle, "he used the car as he would have used his own." Allstate, as Judge Oppenheimer put it, contended "that, under the authorities, the policy should be construed to mean that an automobile is 'regularly furnished' for use where the bailee has a blanket permission to use the loaned vehicle, uses it as his own during the term of the bailment and has it continuously available for his use during the period. Allstate submits that it is the unrestricted use of the vehicle which is determinative and that the duration of the period in which that use is permitted is immaterial." After

quoting from various dictionaries as to the meaning of the term "regular," as reported in the majority opinion, the Court said:

"There are many decisions in other states which have considered the phrase involved in this case, and, in the majority of them, the period of time for which the use of the automobile was given is considered as one of the elements which determine whether or not there is coverage. Appleman states: 'The words "regular use" suggest a principal use as distinguished from a casual or incidental use.' 7 *Appleman Insurance Law and Practice* § 4455 (1962). See 7 Am. Jur. 2d *Automobile Insurance* § 107 and Annot., 'Exclusion from "drive other cars" provision of automobile liability insurance policy of other automobile owned, hired, or regularly used by insured or member of his household,' 86 A.L.R.2d 937, 951-56 (1962), and cases therein cited. If Allstate had wished, it could have incorporated in the policy the restrictions on the meaning of 'regularly used' which it now asks the Court to find implied in the language actually used. We hold that the period and frequency of the permitted use are elements to be considered in the determination of whether, on the facts, there was coverage under the policy." *Id.* at 497-98.

The Court concluded "that the automobile involved was not 'regularly furnished' for the use of the appellee and that there was coverage under the policy."

As is suggested in *Humphrey*, a number of cases have defined "regular use" as a "principal use as distinguished from a casual or incidental use." *See, e.g., Kindred v. Pacific Auto. Ins. Co.*, 10 Cal. 2d 463, 465, 75 P. 2d 69 (1938); *Pacific Automobile Ins. Co. v. Lewis*, 56 Cal. App. 2d 597, 600, 132 P. 2d 846, 848 (D. Ct. App., 4th Dist., Cal. 1943); *Miller v. Farmers Mutual Automobile Ins. Co.*, 179 Kan. 50, 54, 292 P. 2d 711 (1956); *Ricci v. U. S. Fidelity & Guaranty Co.*, 110 R. I. 68, 80, 290 A. 2d 408 (1972); *Aetna Casualty & Surety Co.*

*v. Sessions*, 260 S. C. 150, 155, 194 S.E.2d 877 (1973); and *State Farm Mutual v. Smith*, 206 Va. 280, 288, 142 S.E.2d 562 (1965). Use of the various vehicles a total of 70 times in a two year period cannot reasonably be designated as a "principal use," rather use of these fire company vehicles was "incidental" to Winterwerp's activities as a volunteer fireman and quite incidental to his normal employment and use of the vehicle named in his insurance policy.

Several cases take the position that a continuous, uninterrupted, or methodical use of an automobile is required for "regular use." *See, e.g., Travelers Indemnity Company v. Hudson*, 15 Ariz. App. 371, 488 P. 2d 1008 (Div. 1, Dep't B, 1971), and *Hartford Insurance Group v. Winkler*, 89 Nev. 131, 508 P. 2d 8, 13 (1973). In *Hudson* the policy under review contained a clause similar to the one in this case. There an individual by the name of Cooper borrowed a vehicle for "the weekend" from a friend by the name of Norman. Cooper owned an automobile described by the court as "inoperable, the battery being dead and the engine needing timing." This was pushed into Norman's yard, where it was left. Cooper delivered the keys to Norman and drove away in Norman's vehicle. Nothing was said concerning Norman's use of Cooper's car. The court stated that "such use [was] neither . . . expressly prohibited nor agreed to." When Cooper failed to return the vehicle at the agreed time and Norman had need for use of a conveyance the following weekend he proceeded to put Cooper's car into running condition. "[U]sing the borrowed automobile, [he] began a series of tavern stops that ultimately resulted in his driving the borrowed Cooper automobile into the plaintiffs' son, killing him." Travelers Indemnity Company had issued a policy covering the vehicle owned by Norman. In order for there to be coverage it was necessary for the use to have been with the permission of the owner. Permission was found. Travelers then contended that a "finding of implied permission necessarily includes therein a finding that the automobile was furnished to Norman for his 'regular use' and therefore coverage was excluded under the policy provision defining a non-owned automobile as one not

'furnished for the regular use of either the named insured or any relative.' " To this the court said:

> "The phrase 'regular use' is undefined in the policy. However, the term denotes continuous use; uninterrupted normal use for all purposes; without limitation as to use; and customary use as opposed to occasional use or special use. Eureka-Security Fire & Marine Ins. Co. v. Simon, 1 Ariz.App. 274, 401 P.2d 759 (1965); Safeco Ins. Co. of America v. Thomas, 244 Cal.App.2d 204, 52 Cal.Rptr. 910 (1966)." *Id.* at 1012.

In *Wallace Co. v. State F. M. Auto. Ins. Co.*, 220 Ore. 520, 349 P. 2d 789 (1960), the court said:

> "We are of the opinion . . . that the phrase 'furnished for regular use' as used in context does not imply the manner of use, that is, putting the automobile to the same uses to which an insured would use his own automobile, but implies a right to the regular use of the automobile in the sense that there is an expressed or implied understanding with the owner of an automobile that the insured could have the use of the particular automobile or perhaps any automobile of the other *at such times as he desired,* if available.
>
> "The term 'furnished for regular use' does not embody the term 'for temporary use,' but describes the antithesis thereof. It, therefore, expresses no thought of excluding protection in those situations where the use is but for a single occasion or single purpose." *Id.* at 526. (Emphasis added.)

The tests applied in *Hudson, Sessions, Winkler, Wallace,* and *Ricci* all focus upon the idea of a day-to-day, predictable, customary use of a vehicle. Under the approach used by these cases the frequency of the insured's use of the automobile is a significant factor. In the case at bar the insured's use of one out of the fleet of fire trucks depended on three main factors: a fire in the vicinity, his choosing to

respond to the call, and his arriving in response to the call early enough to be designated to drive one of the fleet. He was a volunteer without any obligation to so respond. This use is by its nature unpredictable and unmethodical. Use of one vehicle out of the fleet 70 times in two years, an average of less than once every two weeks, is not the kind of day-to-day frequency contemplated by these cases.

In addition to the pattern of use, a second criteria, used by many cases, is the concept of control of the use of the vehicles. The *Hudson* definition of "regular use" required "use for all purposes." The extent of control exercised by the owner affects the nature of the use of the automobile by the driver. Both are significant factors in decisions applying this type of exclusionary clause. *See, e.g., Southern Ry. v. State Farm Mut. Auto. Ins. Co.*, 357 F. Supp. 810 (N.D. Ga. 1972), *aff'd* 477 F.2d 49 (5th Cir. 1973); *Grace v. Hartford Accident and Indemnity Company*, 324 F. Supp. 953 (N.D. Ga. 1970), *aff'd* 440 F.2d 411 (5th Cir. 1971); *Waggoner v. Wilson*, 31 Colo. App. 518, 524, 507 P. 2d 482 (1972); *Lincombe v. State Farm Mutual Automobile Ins. Co.*, 166 So. 2d 920, 924 (Ct. App., 3d Cir., La. 1964); *Glisson v. State Farm Mut. Auto. Ins. Co.*, 246 S. C. 76, 85, 142 S.E.2d 447 (1965); and *State Farm Mutual v. Smith*, 206 Va. 280, 288, 142 S.E.2d 562 (1965). In *Southern Ry.* the insured at the time of the accident was driving a vehicle belonging to her brother-in-law. The court found the facts did not justify a conclusion that she had a regular use of the car saying:

> "She could use the [car] only to go to and from work; and that if she wanted to use the car for any other purpose she would have to get permission either from her sister or her brother-in-law. Furthermore, she was only working . . . during that summer before entering college.
>
> "Therefore, the [car] was not furnished to [the insured] for her 'regular use', but only for the restricted use of going to and from a summer job."
> *Id.* at 813-14.

This case strongly suggests that to constitute "regular use"

one must be able to use the vehicle for any purpose one chooses. This obviously is not the situation with reference to Winterwerp since he could use the fire company vehicles only for the normal purposes of the fire company.

In *Waggoner* the insured was selling the vehicle in question to an individual pursuant to an oral sales agreement at the time of the accident giving rise to the dispute. Possession had been delivered to the buyer, but title was retained by the insured for security. Apparently, the insured still had some access to the car after delivery of possession, for the trial court found that "the auto-mobile . . . 'was not used by [the insured] more than two or three times' in the four month interval between the sale and the accident in which plaintiff was injured." It also found that the insured "had obtained permission from [the buyer] to use the automobile on the date of the accident." It concluded that the car was not "furnished or available for the frequent or regular use of the named insured," rea-soning:

> "The connotation of the term 'furnish' suggests that it refers to instances when the automobile was actually utilized by [the insured]. The terms 'available' and 'furnished' are not synonomous. With regard to the purpose of the clause, we construe 'available' to require that *the potential use of the automobile be to a substantial degree under the control of the insured.* A car is not 'available' where, as here, the keys and specific permission must be obtained each time use of the car is desired." *Id.* at 524. (Emphasis added.)

It could not be asserted that Winterwerp exercised control over the fire company vehicles "to a substantial degree."

In *Glisson* a clergyman was on temporary duty with the State National Guard. The automobile in question was a jeep furnished to him as "officer of the day." His regular duties with the National Guard were as a parts clerk in the service battery and as motor officer in the headquarters battery. The accident took place while he was on a courtesy

patrol. The jeep was dispatched to him for use in performance of his duties as officer of the day. The court analyzed the situation as follows:

"At the time of injury, Cheezem was temporarily engaged in the duty of Officer of the Day, thus performing a different duty than that normally required of him. The 'jeep' was not furnished for his regular use but, rather, was assigned to him for use in performing the duty of Officer of the Day. There is no evidence in the record as to how frequently Cheezem used this 'jeep'; however, his use thereof was necessarily limited as he could only use this vehicle if it was properly dispatched to him." *Id.* at 85.

The key to this analysis is control: that Cheezem's use was not regular was evidenced by the fact that he had no control over the vehicle, but might utilize it only when dispatched to him. This situation is analogous to Winterwerp's: he uses the brush truck or any other vehicle of the volunteer fire company *only* if he arrives at the firehouse at the proper time during an emergency — prior to the time when sufficient other volunteers have arrived to operate the vehicles being used.

The mathematical odds were much against Winterwerp's insurance company's being obliged to pay a claim by virtue of his operation of one of the fire company vehicles if the non-owned endorsement provision were held to afford coverage. This is so because of the presence of public liability insurance on the part of the fire company providing primary coverage and the fact that there could only be liability on the part of Winterwerp's company in the unusual circumstance here where a fellow fireman was killed and the fire company policy had a clause excluding liability in such event.

We have here no "situation in which the members of one family or household may have two or more automobiles actually or potentially used interchangeably but with only one particular automobile insured," to which Judge Chesnut alluded in *Aler,* nor do we have a situation where, as it was

put in *Rodenkirk*, cited by Judge Chesnut in *Aler*, the vehicles were "under [Winterwerp's] control [so] that he could use [them] at will and might use [them] often." Winterwerp's use of the vehicles in question was not at will nor was his use merely when he desired such use. He had no uninterrupted, normal use for all purposes. There was no personal use by Winterwerp.

We opened the opinion in *Prince Geo's Co. v. Chillum-Adelphi*, 275 Md. 374, 340 A. 2d 265 (1975), with the statement:

> "As every resident of this State who lives outside of the urban areas of the State knows, volunteer firemen perform an important and necessary service. Without them property in such areas would be unprotected from the ravages of fire and in extinguishing fires people would be reduced to use of the archaic methods of a bygone era." *Id.* at 375.

Winterwerp's use was a special use in the performance of volunteer emergency duty on behalf of his fellow citizens. There could be no use by him in the absence of a fire, his response, and a response early enough for him to be assigned to drive. In *Humphrey* there was unrestricted use, but the Court held there was coverage. Use of the five vehicles here 70 times in a two year period cannot be reasonably designated or defined as a principal use. Winterwerp's use in each instance was only for a relatively short period of time since the vehicles were only operated in going to and from a fire in the area of his volunteer fire company. Such use was incidental to Winterwerp's activities as a volunteer fireman. The use of the fire company's vehicles falls far short of a regular use by Winterwerp.

I recognize the holding in *Humphrey* that such a clause was not ambiguous. It occurs to me, however, that what we here see by way of a division on the part of the Court may well indicate that although the clause was not ambiguous in the context of the facts in *Humphrey*, it is ambiguous as applied to the facts of this case. In such situation, in the words of Judge Hammond for the Court in *Penn. etc., Ins.*

*Co. v. Shirer*, 224 Md. 530, 537, 168 A. 2d 525 (1961), "if the insurance company, in attempting to limit coverage . . . , failed to make its intended meaning clear and drew an ambiguous clause, that ambiguity would be resolved against it as the one who drafted the instrument, as is true in the construction of contracts generally, *Ebert v. Millers Fire Insurance Co.*, 220 Md. 602, 611, and cases cited; *Employers' Liability Assurance Corporation, Ltd. v. Reed's Refrigeration Service, Inc.*, 222 Md. 49, 54."

Coverage should be afforded.

I am authorized to say that Judges Digges and Eldridge concur in this dissent.