INSURANCE COMPANY OF NORTH AMERICA *v.*
RONALD H. COFFMAN ET AL.

[No. 268, September Term, 1982.]

*Decided November 5, 1982.*

The cause was argued before WILNER, GARRITY and ADKINS, JJ.

*M. King Hill, Jr.,* with whom were *John R. Penhallegon* and *Smith, Somerville & Case* on the brief, for appellant.

*Donald F. Oakley,* with whom were *Marvin Ellin, Jonathan Schochor* and *Ellin & Baker* on the brief, for appellees Jeffrey V. and Cleo J. Sippel.

WILNER, J., delivered the opinion of the Court.

The genesis of this case was an automobile accident that occurred on July 7, 1978, involving a van owned by Bethlehem Steel Corporation. The van was used by Bethlehem as a dispensary vehicle — to transport injured employees to hospitals or other medical facilities.

The accident occurred while Ronald Coffman, a Bethlehem employee, was transporting his fellow employee Jeffrey Sippel to such a facility. Coffman "ran" a red light and collided with a vehicle lawfully in the intersection. Sippel was injured in the accident and he and his wife eventually sued Coffman in the Baltimore City Court to recover for their injuries. Coffman referred the lawsuit to appellant INA — the insurer of his personal car — to defend. On March 30, 1979, INA formally declined such defense (and liability for any resulting judgment) on the ground that "[t]he vehicle being operated by you at the time of this accident does not qualify under the definitions of this policy as being an owned auto, non-owned auto or temporary substitute vehicle. . . ."

Faced with that rejection, Coffman filed this declaratory judgment proceeding in the Superior Court of Baltimore City seeking a declaration that (1) INA is required to defend him and pay any judgment arising from the Sippel lawsuit, in accordance with its insurance policy, and (2) Bethlehem also is required to defend the action and indemnify him against such resulting judgment. Prosecution of the Sippel suit was stayed pending the outcome of this proceeding.

All parties filed motions for summary judgment. Ultimately, the court entered judgments declaring that (1)

INA is required to defend and, to the extent of its policy limits, indemnify Coffman, and (2) Bethlehem is not so required. No appeal was taken from the judgment regarding Bethlehem; INA has brought this appeal challenging the judgment adverse to it.

## I. *The Policy Language*

Coffman's policy obligated INA to pay on behalf of Coffman "all sums which the Insured shall become legally obligated to pay as damages because of . . . bodily injury . . . sustained by any person . . . arising out of the ownership, maintenance or use of the owned automobile *or any non-owned automobile."* (Emphasis supplied.) The "owned automobile" referred to in the policy was Coffman's personal vehicle, which was not involved in the accident. A "non-owned automobile" was defined as "an automobile or trailer not owned by *or furnished for the regular use of . . . the Named Insured* . . . other than a temporary substitute automobile." (Emphasis supplied.)

With this definition, Bethlehem's van would not qualify for coverage as a "non-owned automobile" under the policy if it was furnished for Coffman's "regular use."

There are two other provisions of the policy relevant to the controversy. In the "Exclusion" section, the policy provides:

"This policy does not apply under Bodily Injury or Property Damage Liability Coverage:

\* \* \*

(h) to a non-owned automobile while maintained or used by any person while such person is employed or otherwise engaged in

\* \* \*

(2) any other business or occupation of the Insured, but this exclusion (h) (2) does not

apply to a *private passenger automobile* operated or occupied by the Named Insured. . . ." (Emphasis supplied.)

The term "private passenger automobile" is defined in the policy as "a four wheel private passenger, station wagon or jeep type automobile."

## II. *The Controversy*

Coffman claims coverage under the policy on the basis that Bethlehem's van was a "non-owned automobile." INA defends on two grounds: (1) that the van was furnished by Bethlehem for Coffman's "regular use," and therefore it does not qualify as a "non-owned automobile"; and (2) that even if the van did qualify· as a "non-owned automobile," it is excluded from coverage under section (h) (2) of the policy exclusions. This latter contention is based on the assertion that the van was used in Coffman's "business or occupation" and was not a "private passenger automobile."

Coffman, in response, argues that INA had waived that second defense by failing to mention it in the March 30, 1979, letter of rejection.

The court gave no explanation for its decision to grant Coffman's motion for summary judgment, other than a reference to "the reasons set forth in *Defendants'* Motion for Summary Judgment and the supporting Memorandum. . . ." (Emphasis supplied.) We must assume that that reference was a mistaken one, as INA's motion and memorandum would hardly support the court's action. In any event, the issues now before us are (1) whether there was undisputed evidence before the court sufficient to support its implicit conclusion that, as a matter of law, the van qualified as a "non-owned automobile"; (2) whether INA had waived its right to raise the "exclusion" defense; and (3) if it did not waive that right, whether the evidence sufficed to support an implicit finding that the exclusion did not apply.

### III. *The Evidence*

Coffman had been employed by Bethlehem since 1969 as a forktruck driver. His job involved moving heavy materials around the Bethlehem shipyard on a forktruck. In addition to the forktruck and other such vehicles used within the confines of the shipyard, Bethlehem owned several vehicles that were used outside the shipyard. In addition to the dispensary van, the company owned two limousines used for transporting "dignitaries" and a "stake-body" truck used for transporting less dignified cargo. These were commonly known as "over-the-road" vehicles.

The dispensary van was a 1974 Ford Econoline Club Wagon designed to seat eight people. It had a six-cylinder engine and was built on a unibody sedan chassis. As noted, the van was used exclusively to transport sick or injured workers to appropriate medical facilities in and around the city. It was not available for the personal use of Bethlehem employees; when a trip was completed, the van was returned to the Bethlehem shipyard.

Jimmy Swaine was the Bethlehem employee regularly assigned to drive the dispensary van. On those few occasions when he was ill or on vacation, a supervisor in Bethlehem's transportation department would designate one of five employees in that department to act as substitute driver. Coffman was one of those five employees, and occasionally he was selected to drive the van, or the "stake-body" truck, or one of the limousines. In the ten years of Coffman's employment prior to the accident, he had been assigned to drive the van as a substitute for Swaine a total of four times, some of those times being for a day or less, some apparently for longer periods. He drove the limousines an average of twice a year and the "stake-body" truck about five times a year.

Swaine was due to be on vacation from July 3 through July 7, and Coffman was designated to substitute for him that week. He drove the van, using itineraries chosen by the supervisor, on July 3, 5, and 6, and was, of course, driving it on July 7, when the accident occurred.

## IV. *Was The Van A Non-Owned Automobile?*

INA argues that, despite Coffman's rather infrequent use of the van, it nevertheless was furnished for his "regular use." Attempting to latch onto a concept expressed in *Winterwerp v. Allstate Insurance Co.,* 277 Md. 714 (1976), INA argues that the van was one of a "pool" of "over-the-road" vehicles — *i.e.,* the limousines and "stake-body" truck — and that the question of "regular use" has to be judged in terms of his use of any and all of the vehicles in that pool. We think that INA has stretched *Winterwerp* well beyond its logical circumference.

Mr. Winterwerp, a fireman employed by the Baden Volunteer Fire Department, was involved in an accident while driving a "brush wagon" — a type of firetruck — owned by the Department. It was one of six emergency vehicles owned by the Department and "used in varying combinations depending on the nature and extent of the particular emergency to which they were responding." 277 Md. at 716. The record showed that in the two-year period preceding the accident, Winterwerp had driven one or another of the six vehicles on seventy occasions and had driven the "brush wagon" on ten occasions.

Adopting the conclusions reached in *Aler v. Travelers Indemnity Co.,* 92 F. Supp. 620, 623 (D.Md. 1950), the Court, at p. 718, regarded the "furnished for regular use" clause as follows:

> "The general purpose and effect of this provision of the policy is to give coverage to the insured while engaged in the only infrequent or merely casual use of an automobile other than the one described in the policy, but not to cover him against personal liability with respect to his use of another automobile which he frequently uses or has the *opportunity* to do so." (Emphasis added by Court of Appeals.)

The word "regular" in that clause, said the Court, quoting from *Allstate v. Humphrey,* 246 Md. 492, 497 (1967), is "the antonym of 'casual' or 'occasional'; and mean[s] ' "steady or

uniform in course, practice or occurrence; ... steadily pursued; ... functioning at proper intervals; ... recurring ... at stated, fixed, or uniform intervals." ' " *Id.* at 719. In determining whether a given use is "regular" or only "casual or occasional," a court might properly consider "the period and frequency of the permitted use," whether "special permission must be obtained whenever [the vehicle] is driven," and, where the vehicle is owned by the insured's employer, "whether such driving is among the employee's duties." *Id.* at 720.

Upon the record then before it, a bare majority of the *Winterwerp* Court concluded that "there was nothing temporary or limited about the insured's connection with the firefighting vehicles." Given the insured's steady and continuous participation as a volunteer fireman with the Baden Department and the fact that "the six vehicles were at all times available for use by the insured in conformity with his prescribed duties," the majority concluded that "the firefighting vehicles were furnished or available for the regular use of the insured and that their use by the insured was, therefore, excluded from coverage" under his individual policy. *Id.* at 721.

The dissent in *Winterwerp* (Judges Smith, Digges, and Eldridge) urged a narrower, more stringent definition of what constituted a "regular" use. Quoting from *Rodenkirk v. State Farm Mut. Automobile Ins. Co.,* 60 N.E.2d 269 (Ill.App. 1945), they suggested that the purpose of the exclusionary clause was to protect against a situation in which

> "an insured could pay for one policy and be covered by the insurance in driving any car that he decided to use whether owned by him or members of his family, or cars that had been furnished for his *regular use; in other words, cars under his control that he could use at will and might use often.*" 277 Md. at 723. (Emphasis supplied by dissent.)

A "regular use," the dissent argued, was a "principal use as distinguished from a casual or incidental use." *Id.* at 724, quoting from *Allstate v. Humphrey, supra,* 246 Md. at 497,

which, in turn, quoted from 7 Appleman, *Insurance Law and Practice* § 4455 (1962).

We must, of course, assume the continued validity of the majority's view in *Winterwerp;* but even so, the case before us presents a quite different picture than that evident in *Winterwerp.* The manner and frequency of Coffman's use of the van (and the other "over-the-road" vehicles) depicted by the record here demonstrates clearly and as a matter of law that the van was *not* "furnished for the regular use" of Coffman. Even if we were to accept INA's "pooling" argument, which in light of the completely disparate types, functions, and uses of the various vehicles we are not inclined to do, the evidence shows that Coffman's use was occasional and irregular rather than steady, uniform, or regular. Accordingly, from the record before us, it is clear that the van was a "non-owned automobile" within the meaning of the policy.

## V. *Waiver of Exclusion Defense*

As noted, when Coffman referred the Sippel lawsuit to INA, the company denied coverage on the sole ground that "[t]he vehicle being operated by you at the time of this accident does not qualify under the definitions of this policy as being an owned auto, non-owned auto or temporary substitute vehicle. . . ." No mention was made in the letter, or in any other contemporaneous communication, of the additional defense that coverage would be excluded under section (h) (2) of the policy exclusions even if the van were regarded as a "non-owned automobile." That defense was raised for the first time in INA's motion for summary judgment.

INA defends against Coffman's assertion of waiver by claiming that (1) the letter of rejection included, by implication, such a defense, and (2) in any event, coverage cannot be afforded by waiver.

The law regarding the waiver of coverage defenses by insurers was summarized recently in *St. Paul Fire & Mar. Ins. v. Molloy,* 291 Md. 139 (1981). The principal issue there was whether a fire insurance carrier had waived its right to

reject a fire loss claim on the ground of arson — that the insured had deliberately set fire to the property — when the company had not specifically raised that defense in its initial letter of rejection. We concluded, *St. Paul Fire & Mar. Ins. v. Molloy,* 46 Md. App. 570 (1980) as did the trial court, that the arson defense had not been raised in the letter of rejection and that as a result of that omission the insurer had waived its right to rely upon it later. We cited as authority for the proposition that such a defense could be so waived the cases of *Fidelity & Casualty Co. v. Riley,* 168 Md. 430 (1935) and *McElroy v. John Hancock Life Ins. Co.,* 88 Md. 137 (1898).

On *certiorari* review, the Court of Appeals reversed. Citing a number of earlier cases, it acknowledged that "the right of an insurer to forfeit or void the policy may be lost by the doctrine of waiver or estoppel." 291 Md. at 144-45. The Court explained that a waiver in that context meant (or required) "the intentional relinquishment of a known right," that such a waiver may be "inferred from the acts and conduct of the company if those acts and that conduct are inconsistent with an intention to insist upon a strict performance of the condition," and that "conduct in the form of consistent reliance by an insurer on one condition or defense may have the effect of constituting a waiver of other possible known forfeitures." *Id.* at 145. "Whether waiver exists in a given case," said the Court (also at p. 145), "is normally a question for the trier of fact, for the determination of its existence *vel non* turns on the intent of the party ostensibly waiving the right, a state of mind which is to be derived from the facts and circumstances surrounding the purported relinquishment."

The Court of Appeals found it "unnecessary to delve deeply into waiver resulting from the failure of the insurer to promptly inform the insured of a known ground of forfeiture," for it concluded that the arson defense sought to be raised at trial was, in fact, encompassed within the company's initial letter of rejection. *Id.* 146. The Court did, however, in footnote 4 appearing at pp. 146-47, indicate that that determination should not be understood as an implicit

rejection of certain other defenses raised by the company, two of the "seemingly more meritorious" of which were that:

"2. the doctrine of waiver was misapplied by the trial court inasmuch as that principle was utilized to defeat a substantive defense *when proper application of waiver is limited only to those technical policy provisions or conditions the invocation of which results in a forfeiture of otherwise existing coverage;* and 3. the application of the doctrine of waiver by the circuit court in this case creates a liability for a contingency or risk not accepted under the insurance policy, thus effectively creating a new contract for the parties in violation of the *rule of law existing in this State that '[i]nsurance coverage cannot be established by waiver.' Neuman v. Traveler's Indemnity Co.,* 271 Md. 636, 654, 319 A.2d 522, 531 (1974)." (Emphasis supplied.)

The footnote, of course, is *obiter dicta,* not necessary to the result reached by the Court. But the Court no doubt included it for a purpose, and it behooves us to pay close attention to it. The two cases relied on by us in finding a waiver — *Fidelity & Casualty Co. v. Riley, supra,* 168 Md. 430, and *McElroy v. John Hancock Life Ins. Co., supra,* 88 Md. 137 — involved a failure by the claimant to submit a proper proof of loss form within the time limits required by the policy. There was no question about the loss being otherwise covered by the policy; the timely filing of the proof of loss was but a condition subsequent, insisted upon by the company as a prerequisite to its payment of the claim. The actual holding in those cases was that, when the insurer rejected the claim on its merits, as one not being covered under an existing policy, the insurer had, in effect, responded to the claim and thereby waived its right to insist upon the proof of loss.

The aforecited footnote in *Molloy,* with its quotation from *Neuman v. Traveler's Indemnity Co.,* gives a clear indication that the Court of Appeals sees a distinction between

defenses founded upon lack of basic coverage and those arising from the failure of the claimant to satisfy some "technical" condition subsequent. The former, it is apparent, may not be waived merely by the company's failure to specify them in its initial response to the claim, for the effect of that would be to expand the policy to create a risk not intended to be undertaken by the company. *See,* in addition to *Neuman, supra, Aetna Cas. & Sur. Co. v. Urner,* 264 Md. 660, 668 (1972), and cases cited therein. *Compare Medical Mutual Liability Insurance Society of Maryland v. Miller,* 52 Md.App. 602 (1982), involving the defense of an insured's failure to cooperate.

We do not regard INA's March 30 letter of rejection as including the exclusionary defense raised in its motion for summary judgment. But in the circumstance of this case, it is not important whether the exclusionary defense was raised or not raised in the letter, for the effect of applying a doctrine of waiver (or estoppel) would be precisely that which the Court of Appeals has indicated may not be done. If section (h) (2) of the exclusions is applicable, there is no coverage under the policy. The condition expressed in that paragraph is not merely a prerequisite to consideration of a claim. It is, rather, an exclusion from coverage; and, as succinctly stated in *Neuman,* 271 Md. at 654, "[i]nsurance coverage cannot be established by waiver."

## VI. *The Exclusion Defense*

We turn, then, to the substantive question of whether, assuming the van qualifies as a "non-owned automobile," it nevertheless is excluded because it was used by Coffman while engaged in his "business or occupation" and was not a "private passenger automobile." The first element is not in dispute; the van certainly was being used in Coffman's business or occupation. The question of coverage thus boils down to whether the van qualifies as a "private passenger automobile."

The policy defines a "private passenger automobile" as "a four wheel private passenger, station wagon or jeep type

automobile." As pointed out by the Wisconsin Court in *Schilling v. Stockel,* 133 N.W.2d 335, 341 (1965), "[t]his definition is far from enlightening and certainly not free of ambiguity." Where, as here, the vehicle in question is neither a station wagon nor a jeep, "we are left with a definition which states that the term 'private passenger automobile' means a private passenger automobile." *Id.,* 341.

Most courts, when faced with such an ambiguity, have done what the Wisconsin Court did, and construed the language against the draftsman — the insurance company. That, of course, is the Maryland rule as well. *See Mateer v. Reliance Ins. Co.,* 247 Md. 643 (1967); *American Cas. Co. v. Aetna Cas.,* 251 Md. 677 (1968); *National Grange Mut. Ins. v. Pinkney,* 284 Md. 694 (1979). As succinctly stated by the Wisconsin Court, at p. 341:

> "If an insurance company in writing its policy fails so to write a provision as to indicate with reasonable certainty what it means by the provision it has no just cause for complaint that the provision is given a reasonable construction contrary to its contention although its contention may also have reason to support it. In such case we will not do any fine or precise balancing of reasons or splitting of the hairs for the purpose of upholding the company's contention."

The vehicle at issue in *Schilling* was a pickup truck used by its owner as both a passenger car and a farm truck. The owner lent it for the day to his neighbor, who was using it to haul supplies for his tavern business when the accident occurred. On those facts and in light of the ambiguous policy language, the Court declined to rule as a matter of law that the truck was not a private passenger automobile. *See also American Fire and Casualty Co. v. Williams,* 226 So.2d 141 (Fla.App. 1969); *State Farm Mutual Automobile Ins. Co. v. Durrett,* 472 S.W.2d 214 (Tex.Civ.App. 1971); *Detmer v. United Security Insurance Company,* 309 S.W.2d 713 (Mo.App. 1958).

Several courts have taken a somewhat different approach and attempted to fashion criteria by which a court might objectively determine whether a particular vehicle qualifies as a private passenger automobile. Unfortunately, there seems to be no universal consensus as to all of the criteria.

In *Commercial Insurance Co. of Newark, N.J. v. Gardner,* 233 F.Supp. 884 (E.D.S.C. 1964), the Court noted, at p. 888 (citations omitted):

> "The courts have used at least three different criteria to determine if an automobile is a 'private passenger automobile' — (1) the test used by some courts is the type of vehicle as opposed to its ownership. . .; (2) other courts have applied the test of the use to which the vehicle is put. . .; (3) still other courts have applied the test of ownership. . . ."

That case involved a police car being driven by the insured in the regular course of his employment as a policeman. Without articulating which, if any, of the enumerated criteria it felt was applicable, the Court held flatly that the publicly owned police car was not a "private passenger automobile" and thus was not covered under the insured's personal automobile policy.

In *Federated American Ins. Co. v. Hargrove,* 475 P.2d 912 (Wash.App. 1970), the Court, citing *Gardner,* held at p. 913 that "[t]here are three factors which generally determine the character of a vehicle [as a private passenger automobile]: type, ownership, and use." Against those criteria, it concluded that a one-ton heavy duty pickup truck owned by a commercial enterprise and used exclusively to haul building materials was not a private passenger automobile. In *Miller v. Farmers Mutual Automobile Insurance Co.,* 292 P.2d 711 (Kan. 1956), however, the Court disregarded entirely the nature of the owner of the vehicle, holding, at p. 715, that "[t]he test to be applied to the word 'private' is the type of vehicle and not its ownership." Thus, it found that a State-owned station wagon which "was not intended for and in fact was not used for any purpose other than transporting not to exceed seven passengers" qualified as a "private

passenger automobile." The Texas Court in *State Farm Mutual Automobile Ins. Co. v. Durrett, supra,* 472 S.W.2d 214, also stressed the purpose and the actual use of the vehicle as controlling factors.

As might be expected, the ultimate answers given by the courts that use an objective criteria approach vary in accordance with the particular factors that are stressed. If the emphasis is on whether the activity is commercial in nature, even vehicles clearly intended and used to transport passengers may be regarded as other than "private passenger automobiles." *See, for example, Kern v. Liberty Mutual Insurance Company,* 274 F.Supp. 360 (E.D.Mo. 1967), *aff'd on other grounds,* 398 F.2d 958 (8th Cir. 1968); *Battle v. Coleman,* 336 So.2d 140 (Fla.App. 1976). As other cases cited above indicate, if the emphasis is on the intended and actual use, the result is different; even pickup trucks have been regarded as private passenger automobiles. *See also Riker v. Aetna Casualty & Surety Co.,* 286 So.2d 493 (La.App. 1974); *Employers Mutual Liability Ins. Co. of Wis. v. Richards,* 332 So.2d 588 (La.App. 1976).

These cases illustrate the difficulty in attempting to rescue the insurance company from the effect of using imprecise terms in its policy. Occasionally, the evidence will be such as to make clear that, by any reasonable test, the vehicle is, or is not, a private passenger automobile. But when, as here, the evidence could fairly lead to different conclusions depending upon which criterion within a matrix of criteria is given the most weight, the courts would do well to follow the Wisconsin approach. Otherwise, we would soon be burdened with a body of hair-splitting decisions and an ominous uncertainty in an area of law that cries out for clarity.

The van at issue here is a "passenger car" for purposes of the State motor vehicle code.[1] It was designed for carrying

---

1. Md. Code Ann., Transp. art. § 11-144.1 defines "passenger car" for purposes of the motor vehicle code as "a motor vehicle, except a multipurpose passenger vehicle or motorcycle, designed for carrying 10 persons or less." Section 11-136.1 defines "multipurpose passenger vehicle" as a motor vehicle that "(1) Is designed primarily for carrying persons which is constructed on a truck chassis or with special features for occasional

passengers and it was used exclusively for that purpose. It was not a "public" vehicle in the sense that anyone could use it. This is enough, we think, to preclude a finding that the van was *not* a private passenger automobile. If INA wished to exclude such a vehicle from coverage as a "non-owned" automobile, it should have said so.

> *Judgment affirmed; appellant to pay the costs.*

off-road operations; (2) Has 3 wheels; or (3) Is of a unique design that does not clearly meet the requirements of any other class, as determined by the [Motor Vehicle] Administrator."