GENEROSO J. DI ORIO AND GENNARO DI ORIO, PLAINTIFFS, v. NEW JERSEY MANUFACTURERS INSURANCE COMPANY, DEFENDANT-RESPONDENT, AND MIKE & JOE'S TEXACO STATION, DEFENDANTS, AND JOHN PALMER, INDIVIDUALLY AND AS GUARDIAN *AD LITEM* OF JON LEIGH PALMER, AN INFANT, DEFENDANTS-APPELLANTS.

Argued March 7, 1978—Decided March 5, 1979.

Mr. *E. Barry Kline* argued the cause for defendants-appellants (*Messrs. Kline, Kline & Canfield,* attorneys; *Mr. Kline,* of counsel; *Mr. Michael R. Canfield,* on the brief).

Mr. *Richard D. Catenacci* argued the cause for defendant-respondent (*Messrs. McElroy, Connell, Foley & Geiser,* attorneys; *Mr. Catenacci,* of counsel and on the brief).

The opinion of the court was delivered by
CLIFFORD, J.

I

This declaratory judgment action was instituted to determine the scope of coverage under a standard family automobile policy of insurance. The controversy derived from a one-vehicle accident of May 1, 1968. The automobile involved was a 1956 DeSoto owned by Mike & Joe's Texaco Station, a service station business in which plaintiff Generoso DiOrio was one of two general partners. At the time of the accident Generoso's 17 year-old son, plaintiff Gennaro DiOrio, a member of the same household, was operating the car. A passenger, defendant Jon Leigh Palmer, an infant, sustained severe personal injuries in the accident. Suit was brought on his behalf against the DiOrios, father and son,[1] and against the service station.

Reliance Insurance Company, liability carrier of Mike & Joe's Texaco Station, offered the Palmers its full policy limit of $50,000. This being inadequate fully to compensate for the passenger's injuries and damages, excess coverage was sought from defendant New Jersey Manufacturers Insurance Company (NJM) under the DiOrio family automobile policy. NJM disclaimed, whereupon the present suit followed.

The trial court, noting that there was no coverage under NJM's policy for a non-owned automobile "furnished for the regular use of either the named insured or any relative,"[2] ruled in favor of the insurance carrier after finding that the DeSoto had been furnished for the regular use of the named

---

[1] While the DiOrios are defendants in the underlying personal injury action, they appear as nominal plaintiffs in this declaratory judgment suit which is in fact being prosecuted by Jon Leigh Palmer and his father, John Palmer.

[2] "Relative" is defined in the policy as a relative who is a resident of the same household as the named insured.

insured's son, Gennaro. The Appellate Division affirmed the judgment for NJM on that basis.

Thereafter this Court, in a divided decision, reversed the judgment, 63 *N. J.* 597 (1973) (hereafter *DiOrio I*), holding that the courts below had erred in concluding that the automobile was furnished to the son for his regular use. However, we remanded to the trial court for further proceedings addressed to two issues, namely, whether the DeSoto automobile was furnished for the regular use of the father, and whether excess coverage is denied to *all* insureds (and thus to the son) if the vehicle was furnished for regular use of *any* insured (here, the father) even though *not* furnished for the regular use of the insured claiming coverage (the son). In *DiOrio I* we concluded as to the first stated issue that the facts had not been adequately developed below and that the trial court had made no finding as to whether the vehicle was furnished for the regular use of Generoso, the father. 63 *N. J.* at 608. The second issue we characterized as "probably one of law to be resolved in the light of a full record." *Id.* at 607.

Upon the remand the trial court conducted the necessary hearing and made detailed findings and conclusions leading to a dismissal of the complaint. It held that the NJM policy afforded no excess liability coverage to plaintiffs because the service station partnership's DeSoto had been furnished for the regular use of Generoso, and hence the limitations in the policy's non-owned automobile provisions withheld protection from his son, Gennaro.

The Appellate Division affirmed essentially for the reasons expressed in the comprehensive opinion of the trial court. We granted certification, 75 *N. J.* 540 (1977), to review this determination. We affirm.

## II

The policy as to which excess coverage is sought is denominated by NJM as a family automobile policy, a standard

form policy first filed[3] in New Jersey and 47 other states in 1956. As observed by the trial court, its predecessor was the basic automobile liability policy, which continued in use after introduction of the family automobile policy for those partnerships, corporations and businesses not eligible for family automobile policy coverage. The family automobile policy extended coverage to relatives not included in the basic automobile policy, at no additional premium for this additional coverage.

The policy in question provides, on the first page of four pages, that NJM will

pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of [bodily injury and property damage] arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile * * *.

And on the same page a "non-owned automobile" is defined, in language which has remained unchanged for 20 years, as

an automobile * * * not owned by or furnished for the regular use of either the named insured or any relative * * *.

This latter language concerning non-owned automobiles is the current standard version of "drive other cars" coverage. The purpose of such coverage is generally recognized to be

to cover occasional or incidental use of other cars without the payment of an additional premium, but to exclude the habitual use of other cars, which would increase the risk on the insurance company without a corresponding increase in the premium. [Annot., "Exclusion

---

[3]In order for any policy to be written by an insurance carrier licensed to do business in New Jersey it must first be filed with the Commissioner of Insurance and approved by him. Rates likewise must be filed and approved, as must policy endorsement forms. Approximately 900 insurance companies in the United States write automobile liability insurance and 90% to 95% also use the standard form including the limitation language on the use of non-owned automobiles which is the subject of this litigation.

from 'drive other cars' provision of automobile liability insurance policy of other automobile owned, hired, or regularly used by insured or member of his household," 86 *A. L. R.* 2d 937, 940 (1962).]

On the other hand the industry has developed, and NJM offered, a specific "extended non-owned automobile coverage" endorsement which appears to contemplate the DiOrios' situation exactly. This endorsement extends liability coverage for the persons named therein to "any automobile" not owned by a member of the named insured's household — a significant variation from the coverage provided by the policy in question. The former protects all family members for whom the extended coverage is sought and as to whom a separate premium is calculated and charged. The record demonstrates that excess personal injury liability coverage in the amount of $250,000 per person and $500,000 per accident was available under this "extended non-owned automobile coverage" endorsement for a premium of about $6 for Generoso and $8 for Gennaro DiOrio.

Anent this very point the trial court observed:

The majority opinion [in *DiOrio I*] raised the issue of "the underwriting concept" which "the insurer had in mind," and whether the carrier afforded the additional non-owned automobile coverage and "charged little or nothing for the additional coverage." The facts presented at trial establish clearly that the insurer's intent was not to provide under the basic policy the coverage of the type claimed by plaintiffs, for it provides such coverage by endorsements specifically designed for that purpose, and for which additional premiums are charged.

We conclude, as did the trial court, that without such an endorsement, the NJM policy will not yield the coverage claimed by plaintiffs in this case.

III

██ The first question remanded by *DiOrio I* for determination by the trial court was the factual issue of whether the automobile was furnished for the regular use of the

plaintiff Generoso, the father. As indicated, this question was answered in the affirmative, a determination amply supported by the evidence. Indeed, so strong is the record in this regard that the conclusion is well-nigh inescapable.

NJM had written Generoso DiOrio's personal automobile insurance for about 20 to 25 years. The 1956 DeSoto was originally owned by Generoso and used by him as his personal car. Until 1966 it was listed as an owned automobile on the family automobile policy issued by NJM. In that year Generoso purchased a new 1967 Chrysler for his personal use and transferred the title of the DeSoto to Mike & Joe's Texaco. The DeSoto replaced a Chevrolet then owned by the partnership, whose automobile liability insurer, Reliance, thereupon amended the service station's policy to cover the DeSoto in place of the Chevrolet. Simultaneously, and significantly, Generoso instructed NJM to remove the DeSoto from the family automobile policy and to substitute the Chrysler in its place.

Thereafter, and up until the time of the accident, the partnership used the DeSoto as a service car, loaning it to customers whose vehicles were being repaired and sending it out on business errands. Unless a customer needed the automobile, Generoso drove it home every night. He estimated that on less than twenty occasions in six years had customers kept the service car overnight. As had been the case with the Chevrolet which it replaced, the DeSoto was Generoso's only means of getting to and from work inasmuch as his wife commuted to her job in the family's Chrysler. Generoso's testimony on remand, confirmed by his partner, was that there was no "restriction whatsoever on how and why and when [he] could use the DeSoto."

Generoso undertook to give driving instructions to his son, Gennaro, starting in January, 1968 and continuing several times a week up until shortly before the accident. Only the DeSoto was used for this purpose. In addition Generoso used the vehicle for personal errands. After Gen-

naro obtained his license on April 23, 1968, he was permitted to drive the vehicle several nights a week and on weekends — this with the express permission of his father and subject to his returning home at a specified hour. In all respects, then, the DeSoto was used as one might expect any second family car to be.

In reaching the conclusion that the DeSoto was "furnished for the regular use of" Generoso the trial court took note of a question which arises as to "whether the court may consider * * * evidence of business use of the vehicle and particularly use of the vehicle to commute to and from work." In this connection the trial court was referring to the cases cited in *DiOrio I, supra,* 63 *N. J.* at 608, on both sides of the issue of whether a use beyond the "regular use" for which a car is furnished remains within the policy coverage: *compare Safeco Insurance Co. of America v. Thomas,* 244 *Cal. App.* 2d 204, 52 *Cal. Rptr.* 910 (D. Ct. App. 1966); *Schoeknecht v. Prairie State Farmers Insurance Ass'n,* 27 *Ill. App.* 2d 83, 169 *N. E.* 2d 148 (Ct. App. 1960); *Pacific Automobile Insurance Co. v. Lewis,* 56 *Cal. App.* 2d 597, 132 *P.* 2d 846 (Ct. App. 1943); *American Universal Insurance Co. v. Dykhouse,* 219 *F. Supp.* 62 (N. D. Iowa 1963), aff'd 326 *F.* 2d 694 (8 Cir. 1964), *with Grantham v. United States Fidelity and Guaranty Co.,* 245 *S. C.* 144, 139 *S. E.* 2d 744 (1964); *Iowa Mutual Insurance Co. v. Addy,* 132 *Colo.* 202, 286 *P.* 2d 622 (1955). However, the trial court correctly perceived no necessity to resolve the problem posed by the divergence in these lines of cases inasmuch as the decisions are all factually distinguishable and, more importantly, regardless of the evidence of the business use in this case, "the non-business use of the father and the son with his permission establishe[d] that the vehicle was furnished for the regular use of the father for both business and non-business purposes." The decision rested on the weight of the evidence presented with respect to Generoso's non-business use; and while his *actual* use in that respect may not have

been frequent, his *right* to use the DeSoto for any purpose or to permit any other person to use it for any purpose was entirely unrestricted save for those rare occasions when his partner or a customer needed the car. We agree with the courts below that more than sufficient evidence supports the conclusion that the DeSoto was furnished for the regular use of Generoso DiOrio.

## IV

The question of law which was remanded by *DiOrio I* to the trial court is recited in the pretrial memorandum to be "whether coverage is denied to all insureds and thus to the plaintiff-son if the vehicle was furnished for the regular use of any insured, the father, even though not furnished for the regular use of the insured claiming coverage, the son." The specific policy language in question is that which defines the term "non-owned automobile" as "an automobile * * * not owned by or furnished for the regular use of either the named insured or any relative * * *." NJM argues that even though the DeSoto was not furnished for the regular use of the son, it was furnished for the regular use of the father; and this latter circumstance puts the son's use, albeit not regular, beyond the "non-owned automobile" coverage of the policy. On the other hand plaintiffs urge that the policy definition of "non-owned automobile" is ambiguous, that it may be read so that each insured is covered while driving an automobile he does not own unless it was furnished for *his* regular use, and that therefore the definition must be construed in their favor.

As to the asserted ambiguity of the provision in question, the trial court on remand concluded that the definition of "non-owned automobile" was not ambiguous and meant "exactly what it says, that is * * * 'an automobile * * * not * * * furnished for the regular use of * * * the named insured.' " That determination, which we affirm, is in keeping with the overwhelming weight of authority in those

jurisdictions which have construed the same or similar non-owned coverage provisions and have found them to be unambiguous. Those authorities "reject the view that we look only to the driver of the vehicle to determine whether a reason for exclusion exists." *DiOrio I, supra,* 63 *N. J.* at 609, 611–15 (Mountain, J., dissenting) (collecting cases and secondary materials).[4] The determination that the father's regular use of the DeSoto precludes coverage for the son under the non-owned automobile coverage provision is also in accordance with this Court's decision in *Rider v. Lynch,* 42 *N. J.* 465 (1964), and with the Appellate Division opinion in *Cox v. Santoro,* 98 *N. J. Super.* 360 (1967), holding "clear and unambiguous" the precise provision before us. 98 *N. J. Super.* at 364.[5]

Despite this, plaintiffs seek comfort in so much of the majority opinion in *DiOrio I* as cautions that while read literally the definition in question "seems unambiguous," nevertheless a "sense of ambiguity" arises not because of any syntactical ambiguity but rather because of a feeling of unease about the policyholder's reasonable expectations. 63 *N. J.* at 606–07. The thrust of the argument is that it is

---

[4]Additional cases decided subsequent to *DiOrio I* and in accordance with the weight of authority construing the non-owned automobile provision are *Brooks v. Link,* 212 *Kan.* 690, 512 *P.* 2d 374 (1973); *Urtado v. Allstate,* 187 *Colo.* 24, 528 *P.* 2d 222 (1974) (*en banc*), affirming *Urtado v. Shupe,* 33 *Colo. App.* 162, 528 *P.* 2d 1357 (Ct. App. 1973); *Dairyland Ins. Co. v. Beckman,* 118 *Ariz.* 294, 576 *P.* 2d 153 (Ct. App. 1978). But see *Dairyland Ins. Co. v. Ward,* 83 *Wash.* 2d 353, 517 *P.* 2d 966 (1974) (*en banc;* 6–3 decision) (entire non-owned automobile exclusion clause ambiguous because restrictive language does not appear in section captioned "Exclusions").

[5]We recognize that the definition in question was deemed "confusing" in *Butler v. Bonner & Barnewall, Inc.,* 56 *N. J.* 567, 577 (1970). However, the issue in *Butler* was framed by an incomplete record, unlike the instant matter, and further involved collateral matters of interpretation not pertinent herein. The clarity of the definition, recognized in *DiOrio I* as an issue of law, has been adequately examined and approved below and we endorse it.

within the policyholders' reasonable expectations that the non-owned automobile coverage of each individual under the policy would depend on that individual's use of the car in question, regardless of the regular use of the automobile by another insured. *Id.*

Recognizing the position of laymen with respect to insurance policies prepared and marketed by the insurer, our courts have endorsed the principle of giving effect to the "reasonable expectations" of the insured for the purpose of rendering a "fair interpretation" of the boundaries of insurance coverage. *Kievit v. Loyal Protective Life Insurance Co.,* 34 *N. J.* 475, 482–83 (1960). Thus, the insured's "reasonable expectations" are brought to bear on misleading terms and conditions of insurance contracts and genuine ambiguities are resolved against the insurer. *Gerhardt v. Continental Insurance Co.,* 48 *N. J.* 291, 298–300 (1966) ; *Bryan Const. Co. v. Employers Surplus Lines Ins. Co.,* 60 *N. J.* 375, 377–78 (1972) ; *Remsden v. Dependable Insurance Co.,* 71 *N. J.* 587, 589 (1976). In applying this principle, an objectively reasonable interpretation of the average policyholder is accepted so far as the language of the insurance contract in question will permit. *Linden Motor Freight Co. Inc. v. Travelers Ins. Co.,* 40 *N. J.* 511, 524–526 (1963) ; *Cooper v. Government Employees Insurance Co.,* 51 *N. J.* 86, 93–94 (1968) ; *Perrine v. Prudential Ins. Co. of America,* 56 *N. J.* 120, 126–27 (1970) ; *Karl v. New York Life Insurance Co.,* 154 *N. J. Super.* 182, 186 (App. Div. 1977).

But this forward-leaning policy has no application in the present matter. The definition of "non-owned automobile" contained in the NJM policy, which has the effect here of excluding coverage of the DeSoto, reflects a simple though important purpose: to prevent an insured from obtaining coverage for some or all cars regularly used or owned by the insured by merely listing only one automobile in the family policy (in this case the Chrysler) and thereafter paying a premium calculated by the insurer upon the risk

created by the ownership and use of only that one listed car. This purpose is clearly and conspicuously effected by the placement of the coverage *and* definition provisions of the "non-owned automobile" coverage on the first page of the policy, as the trial court found. We have already determined that the record on remand fully supports the conclusion that the DeSoto was used as a second family car. See *supra* 266. This use of the DeSoto presents the clearest circumstance, when viewed within the objectively reasonable expectation of the average policyholder, in which a reasonable man would expect insurance protection only if the second car being regularly used were specifically listed in the policy under a special endorsement. The case at hand does not pose the situation where the entangled and professional interpretation of an insurance underwriter is pitted against that of an average purchaser of insurance. See *Keeton*, "Insurance Law Rights at Variance with Policy Provisions," 83 *Harv. L. Rev.* 961, 968 (1970). The underwriting policy sought to be achieved by the "non-owned automobile" definition contained in the instant contract of insurance more accurately reflects an objectively reasonable view of the coverage afforded under the policy of insurance.

Furthermore, as a factual matter the record is barren of any suggestion that the DiOrios "expected" that they had primary or excess coverage through the NJM policy for the DeSoto. As we have pointed out, Generoso DiOrio removed the DeSoto from the NJM policy, knowingly and intentionally, with the purpose of avoiding paying a premium for coverage to NJM. Given his obligation to read his insurance contract, which, once again, we recognize as unambiguous in regard to the disputed provision, it cannot be said that the policyholder's legitimate expectations were such that coverage should attach despite the policy language. We therefore conclude that the circumstances before us do not present a persuasive case for resort to the insured's "reasonable expectations."

## V

We have carefully considered defendant's remaining contentions and find them to be without merit. Accordingly, the judgment of the Appellate Division is:

Affirmed. No costs.

PASHMAN, J., dissenting. Today's majority departs from both this Court's earlier decision in *this very case, DiOrio v. New Jersey Manufacturers Ins. Co.,* 63 *N. J.* 597 (1973) (*DiOrio I*), and our well-established policy of effectuating the "reasonable expectations" of insured parties. *See, e. g., Kievit v. Loyal Protective Life Ins. Co.,* 34 *N. J.* 475, 482–483 (1961). Although the majority pays lip service to *DiOrio I* and acknowledges the rule of "reasonable expectations," it in fact adopts the reasoning contained in the dissenting opinion of that decision in order to find in favor of the insurer.

The second trial mandated by *DiOrio I* has thus been rendered a cruel and unnecessary hoax. I believe that we should not now deviate from the principles which we earlier announced. Accordingly, I would vindicate the insured's "reasonable expectations" by holding that the policy at issue does provide excess coverage as to the DeSoto.

In *Mazzilli v. Accident & Cas. Ins. Co.,* 35 *N. J.* 1 (1961), we set out certain principles applicable to the construction of insurance policies. We there stated that:

Solution of a problem of construction of an insurance policy must be approached with a well settled doctrine in mind. If the controlling language will support two meanings, one favorable to the insurer, and the other favorable to the insured, the interpretation sustaining coverage must be applied. Courts are bound to protect the insured to the full extent that any fair interpretation will allow. * * * [D]oubts as to the existence of coverage must be resolved in favor of the insured. * * * [I]f the clause in question is one of exclusion or exception, designed to limit the protection, a strict interpretation is applied.

[35 *N. J.* at 7–8]

Furthermore, because insurance contracts are contracts of adhesion, based on standard forms, couched in technical language and prepared by the insurer's experts, they are to be construed in accordance with the reasonable expectations of the average insured. *See, e. g., Perrine v. Prudential Ins. Co.,* 56 *N. J.* 120, 126 (1970) ; *Allen v. Metropolitan Life Ins. Co.,* 44 *N. J.* 294, 305 (1965) ; *Bauman v. Royal Indem. Co.,* 36 *N. J.* 12, 25 (1961) ; *Kievit v. Loyal Protective Life Ins. Co., supra,* 34 *N. J.* at 482.

The majority attempts to avoid the application of these salutary principles by claiming that the clause is unambiguous. In so doing it directly contradicts this Court's statements in two prior cases. In *Butler v. Bonner & Barnewell, Inc.,* 56 *N. J.* 567 (1970), we declared that the very terminology here at issue was "confusing" with regard to its application to the occasional driver of a non-owned car regularly used by a relative of the driver. *Id.* at 577. In *DiOrio I* the Court noted the prior discussion in *Butler* and expanded upon the existence of the ambiguity. We emphasized that

A sense of ambiguity arises from a sense of surprise when its terms are applied literally, for under a literal reading, it would follow that the *named insured himself* would never be covered, even on an isolated occasion, while driving a car owned by a relative living with him. Thus a most common familial situation is excluded from the coverage of a "family" insurance policy. That exclusion so undercuts the coverage the buyer of a policy would expect under a non-owned automobile provision as to raise a doubt that the insurer could have so intended. * * * Surely no one would expect every member of a household to buy specific coverage for every automobile owned by every other member of the household. The more natural expectation is that each driver would carry his own policy, which policy would be excess insurance as to his operation of the other car or cars. * * * [H]ere there was no purpose to overreach the insurer; the automobile was owned by a business partnership which carried liability insurance on the car. It would be extraordinary to expect the father to take out a second policy on that car.

[63 *N. J.* at 606–607 (emphasis in original)]

Although the Court did not decide the issue, preferring a remand in order to create a full factual record, there can be no doubt that had it made a determination it would have mandated "the sensible result that coverage as to each insured be determined on the basis of *his own* utilization of the car." *Id.* at 607 (emphasis added). This conclusion is supported by cases in other jurisdictions. *See, e. g., Travelers Indem. Co. v. Pray,* 204 *F.* 2d 821 (6th Cir. 1953); *Juzefski v. Western Cas. & Sur. Co.,* 173 *Cal. App.* 2d 118, 342 *P.* 2d 928 (Dist. Ct. App. 1959); *Dairyland Ins. Co. v. Ward,* 83 *Wash.* 2d 353, 517 *P.* 2d 966 (Sup. Ct. 1974) (*en banc*).

The majority, in discussing the issue of reasonable expectations, specifically questions whether the DiOrios in fact believed that the situation here at issue was covered under the policy. Its conclusion is erroneous on two counts. First, in utilizing the "reasonable expectations" test, it is the expectations of the *average* insured which are considered, not those of the particular insured involved in the specific dispute. *Perrine v. Prudential Ins. Co., supra,* 56 *N. J.* at 126. The majority's reasoning would bring about the undesirable result that the meaning of a standard form contract would vary according to the state of mind of the particular insured. Second, the majority's fact-finding is nothing more than pure speculation. Although Generoso DiOrio removed the DeSoto from the N. J. Manufacturers' policy and insured it instead under the partnership name, this does not mean that he did not expect *excess* or secondary coverage. A perfectly reasonable interpretation would be that DiOrio intentionally relinquished only primary coverage when he changed his insurance scheme and that excess coverage was still expected. This is exactly what this Court called "natural" in *DiOrio I* as quoted above. 63 *N. J.* at 606–607. As there stated, it would be unreasonable to expect Mr. DiOrio to insure the same car twice. Moreover, even if it was believed that excess coverage was denied Generoso DiOrio, it might still be expected that his son Gennaro, an occasional user of the

car, would have excess coverage under the family policy. Thus, the majority's speculation into the DiOrios' state of mind is unfounded as well as being legally irrelevant.

The majority today ignores the strong and explicit language of *DiOrio I*. It does so despite the finding of the trial court that "the evidence at this second trial has added little to that which was elicited upon the first trial." I believe that in the absence of any new evidence the proper approach is to follow *DiOrio I* and vindicate the reasonable expectations of the insured.

For the foregoing reasons, I would hold that the "regular use" provision should only exclude from coverage an insured person by whom the car is actually regularly used. Inasmuch as *DiOrio I* held that the car was not regularly furnished for the use of the son, the judgment below should be reversed.[1]

*For affirmance*—Justice SULLIVAN, CLIFFORD, SCHREIBER and HANDLER and Judges CONFORD and HALPERN—6.

*For reversal*—Justice PASHMAN—1.

---

[1]Plaintiffs in this case do not question the underlying validity of the exclusion and the majority does not address the issue. Under these circumstances I would only note that a strong argument could be made that the clause lacks any statutory or regulatory authorization and thus operates as an unauthorized and unwarranted curtailment of coverage. It could also be persuasively argued that this clause should be invalidated on public policy grounds in light of this State's paramount public policy that injured accident victims be compensated to the fullest extent possible. This is especially compelling in view of the anomalous result, from the viewpoint of the injured son, that he is penalized by the fortuitous fact that the borrowed car he was driving was regularly furnished for his father's use when, had he been driving any other borrowed car, he would have been covered.