685 P.2d 802

Jack W. FOSTER, Betha Foster, Rodney Scott Baldwin and Deborah Lynn Baldwin, Plaintiffs, Respondents, Cross-Appellants,

v.

Dave JOHNSTONE, individually and as an agent for the Prudential Insurance Company, Prudential Property and Casualty Insurance Company, a corporation, The Prudential Insurance Company of America, a corporation and Does III, IV and V, Defendants, Appellants, Cross-Respondents.

No. 14774.

Supreme Court of Idaho.

June 7, 1984.

Rehearing Denied Aug. 30, 1984.

Willis E. Sullivan, III, and David W. Cantrill, Cantrill, Skinner & Sullivan, Boise, for defendants, appellants, cross-respondents.

Ellison M. Matthews, Matthews & Wilson, Chartered, Boise, for plaintiffs, respondents, cross-appellants.

HUNTLEY, Justice.

Dave Johnstone (Johnstone), sales agent for the Prudential Insurance Company (Prudential), and Prudential Insurance appeal from jury verdicts in favor of Rodney and Deborah Baldwin, insureds under an

automobile insurance policy with Prudential. The action arose out of a denial of policy coverage by Prudential for liability incurred by Deborah Baldwin when she collided with another vehicle while driving her father's truck.

About the 10th of February, 1976, the Baldwins purchased an automobile insurance policy from Prudential. Agent Johnstone went to the Baldwins' home, where the policy and its coverage were discussed. It is alleged by the Baldwins that Johnstone, upon being specifically questioned whether the policy would cover "any non-owned vehicle" the Baldwins might be driving, assured the Baldwins that it would. Johnstone testified he did not remember being asked if the coverage extended to *any* non-owned vehicle, but he did outline the basic coverage provisions for non-owned automobiles, namely that the policy "would cover them for any non-used [sic] automobile that they might borrow in case of breakdown or if they had to use somebody else's vehicle for a non-business type use."

About a year-and-a-half after they purchased the policy, Baldwins formed a partnership with Deborah Baldwin's parents, Mr. and Mrs. Foster, to go into the manure-spreading business. Each couple contributed a truck. The Baldwins' truck was not insured under their policy with Prudential. Baldwins owned another truck, also insured under a separate policy, which Rodney Baldwin used in his primary occupation of hauling gravel.

On October 27, 1978, Deborah Baldwin was working with her father in the partnership operation. They were spreading manure with the truck owned by her father. After the day's work was finished, Mr. Foster asked Deborah to take the truck back to his house so that he could have it serviced over the weekend. On the way, Deborah went through a stop sign and collided with another car. The driver of the other car was severely injured, and brought suit against the Fosters and Baldwins. As primary insurer of the Foster vehicle, Farmers Insurance participated in

a settlement agreement to the limits of its policy. Baldwins sought recovery from Prudential for $45,000.00 they were required to pay under the terms of the agreement, but Prudential denied coverage.

The basis for Prudential's denial of coverage, and the focus of this action, is the policy's limitations on its non-owned vehicle coverage. Policy coverage for non-owned automobiles is restricted to automobiles "not owned by or furnished for the regular use of either the named insured or any relative, other than a temporary substitute automobile." Coverage is further restricted by an exclusion in the policy for any "non-owned automobile ... maintained or used by any person while such person is employed or otherwise engaged in ... (2) any ... business or occupation of the insured...." Prudential has maintained that there is no coverage because first, Fosters' truck was furnished for Deborah Baldwin's regular use (and consequently does not qualify as a "non-owned automobile"), and second, the truck was used in the Baldwin-Foster manure-hauling business.

After trial, the jury returned verdicts in favor of the Baldwins on the basis of coverage under the policy, and estoppel. We will first discuss the errors alleged with respect to the verdict based on coverage of the insurance policy.

## I. Policy Coverage

Prudential contends that it was error for the trial court to find the insurance contract ambiguous as a matter of law. Whether language contained in an insurance policy is ambiguous is a question of law to be determined by the trial judge. *Clark v. St. Paul Property & Liab. Ins. Cos.*, 102 Idaho 756, 639 P.2d 454 (1981). However, Prudential contends that the language in question in the instant case is not ambiguous. We agree. The particular language in question is that which defines non-owned automobile as an automobile "not owned by or furnished for the regular use of ... the named insured," and also that language which excludes from coverage any non-owned automobile which is

"maintained or used" by anyone engaged in "any ... business or occupation of the insured...."

Coverage for non-owned automobiles under policy provisions similar to the one at issue has been a much litigated aspect of insurance law, particularly with respect to the term "regular use." *See* 83 A.L.R.2d 926 (1962); 86 A.L.R.2d 937 (1962); 8 A.L.R.4th 387 (1981). Respondents have cited several cases in support of their contention that the "regular use" language is ambiguous. To the extent that the cited cases stand for that proposition, and most do not, they represent a minority view. The overwhelming weight of authority supports the view that "regular use" and other similar language limiting the extent of coverage provided through non-owned vehicle clauses is not ambiguous. *See Dairyland Ins. Co. v. Ward,* 83 Wash.2d 353, 517 P.2d 966, 971–72 (1974) (Hamilton, J., dissenting; some 35 cases cited in support of the view, and only two cited as holding the language ambiguous); *DiOrio v. New Jersey Mfrs. Ins. Co.,* 79 N.J. 257, 398 A.2d 1274 (1979). *See also Highlands Ins. Co. v. Universal Underwriters Ins. Co.,* 29 Cal.App.3d 171, 154 Cal.Rptr. 683 (1979); *Horridge v. Cooney,* 405 So.2d 1276 (La.App.1981); *Ins. Co. of North America v. Coffman,* 52 Md.App. 732, 451 A.2d 952 (1982); *Grinnell Mut. Reinsurance Co. v. Scott,* 628 S.W.2d 355 (Mo.App.1981); *Spaulding v. Concord Gen. Mut. Ins. Co.,* 122 N.H. 515, 446 A.2d 1172 (1982); *Tollison v. Reaves,* 277 S.C. 443, 289 S.E.2d 163 (1982); *Benjamin v. Plains Ins. Co.,* 650 F.2d 98 (5th Cir. 1981) (applying Texas law).

Respondents contend that "regular use" is ambiguous under our holding in *Moss v. Mid-America Fire and Marine Ins. Co.,* 103 Idaho 298, 647 P.2d 754 (1982). The *Moss* case, however, involved an entirely different policy than the one here at issue. Mr. Moss had purchased commercial hauling coverage in connection with his farming operation. The policy included a "radius endorsement" which rendered the liability coverage ineffective if Mr. Moss made "regular or frequent" business trips outside a 300-mile radius of his home. The

policy we are asked to construe today, however, is a common family automobile policy, and the particular language at issue is the standard version of "drive other cars" insurance coverage. That language has remained virtually unchanged for three decades. *See Miller v. Farmers Mut. Automobile Ins. Co.,* 179 Kan. 50, 292 P.2d 711 (1956). *See also DiOrio v. New Jersey Mfrs. Ins. Co., supra,* 398 A.2d at 1277. There is a substantial body of law construing non-owned vehicle provisions similar or identical to the language at issue in the present case. Almost without exception courts have recognized the validity of these policy provisions. In the words of one court:

> It is well established that the purpose of this provision creating an exception to coverage of non-owned vehicles in automobile insurance policies is to make certain that the insured properly pays premiums on all of the vehicles which are regularly used and therefore are covered by the policy. The non-owned exception, as well as other exceptions involving replacement cars, rental cars, etc., are designed as a convenience to the insured to enable coverage in the case of occasional and sporadic use of such vehicles. To cover a non-owned vehicle regularly used by an insured would cause the insurance company to have to insure vehicles for which the insured did not pay insured [sic] premiums. *Benjamin v. Plains Ins., supra,* 650 F.2d at 100.

█ Moreover, while the Court held in *Moss* that the phrase "regular or frequent" was ambiguous, the Court's determination was primarily concerned with the proper interpretation of such language in light of the facts in that case. The Court was persuaded of a need to submit to the jury the question of whether Mr. Moss's trips outside the 300-mile radius were "regular or frequent." The *Moss* Court quoted from *State Farm Mut. Auto Ins. Co. v. Gudmunson,* 495 F.Supp. 794, 797 N. 4 (D.Mont.1980):

> "I think that the variants in the meaning of common words should be considered

by the finder of fact—normally a jury. Words used in an insurance policy should be given the meaning which the community would generally give them. A jury chosen from the community is probably better equipped to apply community meanings than is a judge. Any effort to apply meanings as a matter of law simply results in the creation of endless distinctions or in a uniformity that is achieved by squeezing sets of facts into molds carefully tailored for other, but slightly different, sets of facts." 103 Idaho at 301–302, 647 P.2d at 757–58.

The *Moss* Court cited a number of cases wherein courts have held that the terms "regular" or "frequent" are not ambiguous but nevertheless present questions of fact to be decided by the trier of fact. 103 Idaho at 301–302, 647 P.2d at 757–58. This Court's holding in *Moss*, however, may have seemed to imply that under Idaho law the question of proper application of such provisions may only be submitted to the finder of fact upon a showing of ambiguity. Indeed, that may seem to be the meaning of the Court's statement in *Clark v. St. Paul Property & Liab. Ins. Cos.*, 102 Idaho 756, 757, 639 P.2d 454, 455 (1981), that "only if a contract is found to be ambiguous does its interpretation and meaning become a question of fact...." To read such language as precluding fact-finding or jury involvement absent a finding of ambiguity would be to overlook the distinction between questions of interpretation of policy language and questions of application of policy language to specific situations. The latter must always necessarily be questions of fact. As the Supreme Court of Illinois stated:

We have considered defendant's argument that the term "frequent or regular use" is ambiguous and that any ambiguity must be construed in favor of the insured. This rule, however, applies only when the language of the policy is ambiguous, and while the determination of whether the non-owned automobile was available for the frequent or regular use of the insured presents a question of fact, that created no ambiguity requiring construction of the language of the policy. *State Farm Mut. Automobile Ins. Co. v. Differding*, 69 Ill.2d 103, 12 Ill. Dec. 739, 370 N.E.2d 543, 545 (1977).

■ Thus, while it is true that questions of contract interpretation and meaning may only become questions of fact where there has been found to be ambiguity in the contract, *Clark v. St. Paul Property, supra*, questions of application of policy provisions to the particular circumstances of each case are questions of fact, and must be decided on a case-by-case basis, whether or not the provisions themselves are found to be ambiguous.

■ We cannot accept Respondents' argument that the words "furnished for the regular use of ... the named insured" are ambiguous because they admit of more than one meaning. Application of such a rigid standard to the provisions of insurance policies would render most language ambiguous. The language of standardized contracts must necessarily be somewhat general, in anticipation of varying circumstances and facts. The court in *Commercial Standard Ins. Co. v. Haley*, 282 F.Supp. 16, 20 (S.D.Iowa 1968), stated:

The Court does not feel that there is any room for judicial emasculation of the terms 'regular' or 'frequent.' The ordinary man would have no difficulty in interpreting words of such common usage. 'Regular,' as used in the context of the policy in question, connotes a uniform or recurring course of action or conduct. The term 'frequent' usually portrays the concept of " 'Often to be met with, happening at short intervals, often repeated or recurring, 'as frequent visits.' " *Weaver v. National Fidelity Ins. Co.*, 377 S.W.2d 73, 75 (Ky. [1963] ). Any ambiguities which could be said to be generated by the use of those terms in the policy derive from the fact that their inherent nature necessitates a factual consideration in each case to determine whether the use was 'regular' or 'frequent.' Ambiguities in that sense have apparently led some authorities to

approach the *factual application* of the terms to the manner and extent of use of a commercial vehicle in a liberal spirit. *See,* e.g., *Weaver,* supra; *Indiana Rolling Mill Bailing Corp. v. National Automobile and Cas. Ins. Co.,* 141 F.Supp. 831 (D.Ind. [1956] ), aff'd. 240 F.2d 74 (7 Cir. [1957] ); *Bruins v. Anderson,* 73 S.D. 620, 47 N.W.2d 493 [1951]. But no court has found that the terms themselves need clarification.

*See Moss, supra,* 103 Idaho at 305–306, 647 P.2d at 781–82 (McFadden, J., dissenting).

■■■ As to the exclusion for non-owned automobiles maintained or used in any business of the insured, the same analysis applies. The words "maintained or used" and "business or occupation" have common meanings readily understood by the average person. To hold that they are ambiguous merely because they are susceptible of various applications depending upon the particular facts of each situation would be error. The insurer would have difficulty being more specific, unless it attempted to anticipate specific factual situations and tailor its exclusionary language to each anticipated situation, an obviously impossible task. We hold that the language of the "business or occupation" exclusion to non-owned automobile coverage, like the non-owned vehicle definition just discussed, is unambiguous as a matter of law, and the interpretation of those provisions as applied to the circumstances of the instant case presents questions of fact. Accordingly, it was error for the district court to admit testimony of the parties regarding their actual intentions at the time the insurance contract was entered into as evidence of the meaning of the terms "furnished for regular use" or "maintained or used" in any "business or occupation" of the insured.

■■■ It should be noted that whether the truck driven by Deborah Baldwin was an automobile provided for her "regular use" within the meaning of the policy, and if not, whether its use is subject to the "business or occupation" exclusion, although they are primarily questions of fact to be decided in light of the circumstances of this particular case, involve to some degree questions of law. The dividing line between legal and factual questions is not always a clear one, and often courts have seen fit to characterize certain questions as "mixed questions of law and fact." *See,* e.g., *Long v. Ins. Co. of North America,* 670 F.2d 930 (10th Cir.1982); *Central Nat. Life Ins. Co. v. Fidelity and Deposit Co. of Maryland,* 626 F.2d 537 (7th Cir.1980); *Humphrey v. Boschung,* 287 Ala. 600, 253 So.2d 769 (1971); *Schwartz v. Helms Bakery Ltd.,* 67 Cal.2d 232, 60 Cal.Rptr. 510, 430 P.2d 68, 71 n. 3 (1967); *Deutsch v. Shein,* 597 S.W.2d 141 (Ky.1980); *Millonig v. Bakken,* 112 Wis.2d 445, 334 N.W.2d 80 (1983). Where reasonable minds could differ as to the determination of a mixed question of law and fact, the ultimate answer must come from the jury. But the court should instruct the jury in the legal standards which should guide their determination. *See State ex. rel. Moretz v. City of Johnson City,* 581 S.W.2d 628 (Tenn.1979) (citing 75 Am.Jur.2d *Trial* § 323, and *Rucker v. Spalding,* 80 U.S. (13 Wall.) 453, 20 L.Ed. 515 (1872)). *See also* Weiner, *The Civil Jury Trial and the Law-Fact Distinction,* 54 Calif.L.Rev. 1867 (1966).

■■■ In *Farm Bureau Mut. Auto. Ins. Co. v. Marr,* 128 F.Supp. 67, 70 (D.N.J. 1955), the court held that a provision similar to the "regular use" clause in the present case presented a question to be determined upon examination of the facts in the particular case before the court. The court discussed a number of guidelines set out by other courts as useful in determining whether an automobile had been furnished for the regular use of the insured, and the court provided several of its own "signposts" for such a determination:

1. Was the use of the car in question made available most of the time to the insured?

2. Did the insured make more than mere occasional use of the car?

3. Did the insured need to obtain permission to use the car or had that been granted by blanket authority?

4. Was there a purpose for the use of the car in the permission granted or by the blanket authority and was it being used for such purpose?

5. Was it being used in the area where such car would be expected to be used?

Where, as here, the factual determination of whether particular policy provisions apply to the circumstances of the individual insured involves application of commonly-used, standardized insurance policy language, the district court should instruct the jury as to any legal standards established in applying such provisions.

## II. Estoppel

■ Prudential contends the district court erred when it submitted the question of estoppel to the jury without proper instructions. The doctrine of estoppel as applied to insurance contracts was described in *Lewis v. Continental Life and Accident Co.*, 93 Idaho 348, 351, 461 P.2d 243, 246 (1969):

> [W]here a policy holder is induced to enter into [a] contract in *reasonable reliance* on promises of or agreements with the soliciting representative of that insurance company thereby leaving the insured person or property otherwise unprotected, and the company profits from that change of position, that the insurance company is estopped to deny the liability for which it actually contracted by raising provisions from its own printed policy form. (Emphasis added.)

We have drawn attention to the words "reasonable reliance" in the above discussion of the elements of estoppel because it is in this area where we find the district court's instructions to the jury flawed. While it is true that the instructions did contain language similar to that quoted above, the elements of estoppel as applied in insurance contract cases were not separately set out, and no instruction was given on the meaning of the legal terminology "reasonable reliance." Taken together, the instructions could easily suggest to the jury that it was necessary only to find a representation of coverage and a reliance

on that representation in order for the insurance company to be estopped from denying coverage according to the terms of its policy. Because the court's instructions to the jury misrepresented the law, and failed to set out with clarity the requisite elements for the jury to find estoppel, the jury verdict based on the legal doctrine of estoppel must be reversed and the case remanded for a new trial.

■ On remand the jury should be instructed that the Baldwins' reliance on agent Johnstone's oral representations must have been "reasonable." While some jurisdictions have held that an insurer can only be estopped from denying coverage where the insured has not received a copy of the policy before the loss occurs, *see, e.g.*, *Gen. Ins. Co. of America v. Truly Nolen of America, Inc.*, 136 Ariz. 142, 664 P.2d 686 (Ariz.App.1983), that is not the law in Idaho. However, where facts exist which tend to indicate the insureds should have been aware that the policy excluded coverage contrary to the representations of the agent, the trier of fact should consider those facts as bearing on the issue of reasonableness. In the present case it appears the jury had no opportunity to consider the length of time which had elapsed since the policy was received and before the accident occurred (over two years) and to what extent the Baldwins had opportunities to verify the coverage under the policy. It is certainly not the law in Idaho that an insured has no obligation to read his policy, and may with confidence rely on subjective impressions he may have obtained in talking with an agent prior to entering into an insurance contract. Moreover, there are some types of policy coverage or exclusions which have become so common in certain areas of insurance law as to be nearly identical in wording and function in virtually all comparable insurance policies. In determining the reasonableness of an insured's reliance on an agent's oral representations, consideration should be given to the type of policy involved, and the likelihood of the coverage existing in light of industry norms and common experience.

One of the factors mentioned in *Lewis, supra,* leading to a determination of estoppel is an oral promise or agreement upon which the potential insured relies and is thereby left unprotected (absent estoppel). Supposing the Baldwins were made aware of the policy's limitations on coverage for non-owned vehicles and consequently decided to look elsewhere for automobile liability insurance which would cover them in "all non-owned vehicles," it is unlikely they could find a company which would insure them as to *all* non-owned vehicles they might operate, without any limitation as to use whatsoever. A company that would issue such a policy could not stay in business long. A person could insure several cars for the price of one simply by allowing a relative or employer, etc. to hold title. If the technicality of "ownership" were the only obstacle to a person's being able to include other vehicles on his single-premium policy, companies would end up insuring large numbers of automobiles for no additional payment. It is therefore arguable whether the Baldwins were left "unprotected" by agent Johnstone's representations and inducements to purchase the Prudential policy when it is doubtful they could have obtained the type of coverage they hoped to receive anywhere in the industry. Nevertheless, it is possible that Johnstone represented Prudential's coverage of non-owned vehicles as something better than the industry norm, or that it would cover uses outside of mere incidental or irregular use, and that the Baldwins anticipated something less than limitless coverage of all non-owned vehicles, irrespective of nature or extent of use (which "reliance" would seem to be unreasonable, as a matter of law). In any case, Johnstone's representations and the Baldwins' reliance, and the reasonableness of that reliance, present questions of fact for the factfinder, and must be resolved on remand.

The judgment in favor of respondents Baldwins and Fosters is reversed and remanded for a new trial consistent with the foregoing opinion. We do not reach the issue of punitive damages. Costs to appellants; no attorney fees.

DONALDSON, C.J., and BAKES, J., concur.

SHEPARD, Justice, dissenting.

This litigation arose out of a motor vehicle accident in which Deborah Baldwin, driving a pickup owned by her father Jack Foster, collided with a vehicle driven by Grayhl Otto, who sustained substantial injuries. Baldwin was evidently at fault, since settlement was made with Otto for $210,000. Of that amount, various other insurance carriers paid a total of $165,000, and the Baldwins and the Fosters personally paid the remainder. The Baldwins owned a pickup truck which was insured with Prudential, and that policy carried a driving-another-car coverage. Prudential denied coverage, on the basis that the Baldwins' policy excluded coverage where the insureds were driving non-owned vehicles which were regularly used by them and/or used for business purposes.

The Fosters and Baldwins brought this action for the damages sustained by them through refusal of Prudential to provide coverage and for punitive damages. The trial took two days and consisted almost exclusively of evidence presented by plaintiffs. Defendants' only evidence was that of an underwriter for Prudential, who sought to testify only as to the meaning of certain insurance policy terminology, which testimony was excluded by the trial court. Thereafter the jury was instructed and two verdict forms were submitted to the jury requiring their finding on alternate theories of liability, *i.e.,* policy coverage and estoppel. The jury found in favor of plaintiff and against defendants on both theories, *i.e.,* policy coverage and estoppel, and awarded compensatory damages. The jury further found punitive damages in the amount of approximately $72,000. Upon motion for a new trial, the trial court, not having the benefit of this Court's late opinion in *Cheney v. Palos Verdes Investment Corp.,* 104 Idaho 897, 665 P.2d 661 (1983), relied upon the case of *Cox v. Stolworthy,*

94 Idaho 683, 496 P.2d 682 (1972), and reduced the amount of punitive damages by approximately $50,000.

Defendant Prudential appeals from the jury verdict and from the judgment entered thereon, and plaintiffs cross-appeal from the order of the trial court reducing the amount of punitive damages.

Appellant Prudential complains of the form of the special verdicts utilized by the court, but, in my view, the objection voiced by appellant at the court conference did no more than to allow the trial court to utilize, in its discretion, either the special verdict forms drafted by the court or the special interrogatories drafted by defendant Prudential. I find no abuse of that discretion in the submission of the court-drafted forms of verdict to the jury. The form of the verdict, whether general or in special interrogatories, is a matter within the trial judge's discretion and, absent abuse of that discretion, is not a ground for reversal. *Garrett v. Nobles,* 102 Idaho 369, 630 P.2d 656 (1981); *C.C. Anderson Stores Co. v. Boise Water Corp.,* 84 Idaho 355, 372 P.2d 752 (1962); *Ellis v. Ashton & St. Anthony Power Co.,* 41 Idaho 106, 238 P. 517 (1925). While the special interrogatory forms submitted by defendant Prudential might have made the jury decision more clear, and therefore it *might have been preferable,* as above-stated, I find no abuse of discretion in that regard.

Since the jury found in favor of plaintiff on both alternatives, *i.e.,* policy coverage *and* estoppel, if either theory is sustainable, the verdict of the jury as to compensatory damages should stand. I think there is clearly adequate evidence to support the jury's verdict entered on the theory of estoppel. The evidence, taken most favorably to the plaintiffs, indicates that an agent of Prudential represented to the Baldwins that the insurance coverage on their pickup truck would cover them while driving *any other vehicle.* The Baldwins relied upon that representation to their detriment and, as is usual, the actual policy containing the alleged exclusions was not issued for some time thereafter. Follow-ing the accident, two other representatives of Prudential advised the Baldwins that there was coverage for non-owned vehicles under their policy. Hence, I would affirm the jury verdict and the judgment entered thereon on the theory of estoppel.

As to the majority's opinion regarding alleged policy coverage and the alleged ambiguity of the exclusionary clauses, it is my opinion that, while well intentioned, it only further obfuscates the law of insurance in Idaho regarding ambiguities in insurance policies. I believe the case at bar is an excellent illustration of the problems which arise.

There is no question but what Mrs. Baldwin was driving a "non-owned vehicle." The vehicle was owned by Foster. While, as indicated in the majority, the term "regular use" by a non-owned vehicle may be relatively simple language, as is the phrase "non-owned automobile while maintained or used by any person while such person is employed in any other" business of the insured, nevertheless, they cannot be applied in the abstract based only on the policy language. A trier of fact must determine whether the circumstances do or do not bring those exclusionary phrases into effect. Hence, in my view, to that extent, the phrases are ambiguous. Particularly so since earlier in the policy Prudential contracts "to pay on behalf of the insured all sums which the insured [the Baldwins] shall become legally obligated to pay as damages ... arising out of the ownership, maintenance or use of the owned automobile [Baldwins' pickup] or *any non-owned automobile* [the Foster vehicle] ..." (Emphasis supplied.)

Here the question of coverage under the initial non-owned vehicle coverage or exclusion under the "regular use" or "any other business or occupation of the insured" was submitted to the jury with what, in my view, were adequate and sufficient instructions. I cannot determine why the trial court's determination of ambiguity has any dispositive effect. If the court had held that the exclusionary phraseology was not ambiguous, it would nevertheless have had

to submit to the jury the questions of whether the facts and circumstances of this case called into effect that exclusionary language. That is exactly what the trial court did in the instant case, and hence I see no error.

The facts regarding circumstances that would or would not give rise to the effectiveness of the exclusionary clause, as indicated by the evidence, are as follows: The Fosters and the Baldwins were engaged in an informal partnership business for the spreading of manure. Each family used a pickup truck in the conduct of that business. For approximately three weeks, Mrs. Baldwin had assisted her father Mr. Foster in the manure spreading operation because Mr. Baldwin was working elsewhere. On the day in question, Mrs. Baldwin had again assisted her father in the manure spreading operation and had terminated work at the end of the day. As a favor to her father, she then drove his truck from the work site toward his home so that he could service the truck over the weekend. It was during that trip that the accident occurred. In my mind, therefore, several questions arose which were necessary for determination by the jury. Was Mrs. Baldwin a regular user of the truck? While she may have been a regular user of the truck during work in the fields, was her trip after the work day a regular occurrence? Since the work and the work day had terminated, was her performance of a personal favor for her father in delivering the Foster truck to the Foster residence a part of her business or occupation? In view of the fact that the plaintiffs presented the only evidence on these issues, the jury very probably found that the exclusionary language was not applicable under the circumstances presented here and hence found for the plaintiffs on the policy coverage issue.

I am certain in my belief that a new trial will not change the outcome of this case, and because I believe the jury award was not, as a matter of law, erroneous, I would affirm the verdict and judgment for compensatory damages.

The majority opinion attempts to distinguish *Moss v. Mid-America Fire and Marine Insurance Co.*, 103 Idaho 298, 647 P.2d 754 (1982), on the basis that in *Moss* the policy was commercial and in the instant case the policy is a family one. That distinction, I believe, is one without a difference. The sole point is the meaning of the words "regular" and "frequent" in any given insurance policy under the existing circumstances. It is for the jury to decide, and here the jury did so decide for plaintiffs. Even assuming, as held by the majority, that error was committed on the issue of policy coverage, nevertheless, the jury verdict and judgment should be affirmed on the separate and independent ground of estoppel.

As to plaintiffs' cross-appeal, as above-noted, the reduction of the verdict of punitive damages was based on a standard set forth in *Cox v. Stolworthy, supra,* which I view as clearly erroneous in light of our recent decision in *Cheney v. Palos Verdes Investment Corp., supra.* Hence, I would reverse the trial court's order reducing the award of punitive damages and remand for reconsideration pursuant to our decision in *Cheney.*

BISTLINE, Justice, dissenting.

My position in this case is much the same as it was in *Moss v. Mid-America Fire Insurance Co.*, 103 Idaho 298, 647 P.2d 754 (1982), wherein I was the middleman not convinced by the plurality opinion of Justices Shepard and Donaldson, nor by the other plurality opinion of Justices McFadden and Bakes. Writing separately, I mentioned that the insured testified that he asked the local agent's opinion, and was given it. 103 Idaho at 304, 647 P.2d at 758. Unlike that case, however, in this case the insured purchased the policy upon a representation by the agent, as Judge McClintick put it at the hearing on motion for new trial, that there would be coverage when

driving non-owned vehicles.[1] This theory did not creep into the case, but was pleaded in Paragraph VI of the Second Cause of Action pleaded in the complaint.[2]

In arguing the motion for new trial defendant's counsel saw it differently than did the court:

"It's a simple matter as set forth in the pretrial memorandum that estoppel is simply not a viable cause of action here. It should have been fraud. It should have been plead as fraud, and they should have had to prove their case by clear and convincing evidence."

An instruction was given which presented this theory to the jury:

"JURY INSTRUCTION NO. 19

"If you find that Plaintiffs, Rodney Scott Baldwin and Deborah Lynn Baldwin, were induced to enter into a contract of insurance in reasonable reliance on promises of or agreements with the soliciting representative of the insurance company, thereby leaving the insured person or property otherwise unprotected, and the company profits from that change of position, the insurance company is estopped to deny the liability for which it actually contracted by raising provisions from its own printed policy form and you must rule in favor of the Plaintiffs."

On appeal the defendant continues to urge that this was error. It seems to me that defendant continues to believe that the agent's representations must have been made knowingly false. However, while a false statement knowingly made is essential to a fraud theory, it is not required to create an estoppel. The agent may actually believe that which he states to be so, and it is only required that it be a statement made within his ostensible authority. *Martin v. Argonaut Insurance Co.*, 91 Idaho 885, 434 P.2d 103 (1967). What is further required to establish liability is a reliance on the part of the party purchasing the insurance which is reasonable. The above instruction given by the court was derived from the language used by this Court in a unanimous opinion, *Lewis v. Continental Life And Accident Co.*, 93 Idaho 348, 351, 461 P.2d 243, 246 (1969). In that case the Court set forth the facts of a case from the South Carolina Supreme Court, declared that court's reasoning correct, and agreed with it:

1. The court's language was as follows:
"I have announced that I was going to rule at a later time on the punitive damages, and I was in the process of talking about the other objection—or the other bases for the motion for new trial and had indicated that I believed that the theory of liability of estoppel was a valid one under the circumstances in this case.

"If the jury were to find that the plaintiffs asked defendant's agent if they would be covered when they were driving non-owned vehicles, and the agent said, 'Yes, that will be covered by the policy,' then I believe that the company which wrote the policy shouldn't be able to bring up its provisions to deny coverage or drive other—or drive non-owned vehicles.

"Since that is a viable theory of recovery and since the jury did find for the plaintiffs on that theory, the Court, I don't believe, should grant a new trial if it can be—if the jury's verdict can be sustained on any theory, I think that it should stand.

"As you gentlemen both know, the Court was concerned about whether it might have been error to prohibit the defendant underwriter to testify as to what the policy meant. The defendants wrote the policy. There was evidence accepted by the jury that the defendant's agent stated without any definitions or exclusions that if you drive another—a car not owned by you, you're covered, and the insured said, 'Okay, then we'll buy,' that the insurer then should not be permitted to explain that the policy didn't mean what the agent said it meant. The Court will therefore deny a new trial on the basis of denying the underwriter to answer the questions which were designed to explain the meaning of the policy."
Tr., pp. 304–05.

2. Paragraph VI of the Second Cause of Action reads as follows:
"By representing the Plaintiffs DEBORAH LYNN and RODNEY SCOTT BALDWIN that the insurance policy above-described covered the operation of all non-owned automobiles, said representations occurring both before and after the accident above-described, Defendants are now estopped and prohibited from denying coverage based upon exclusions finely drawn in the language of the policy itself."

"Our holding is buttressed by the recent decision of the Supreme court of South Carolina in the case of *Spencer v. Republic National Life Insurance Company* [243 S.C. 317, 133 S.E.2d 826 (1963)]. The facts in that case are literally exactly on point with this one insofar as the question of initial coverage is concerned. In that case, a county changed group insurers to avail itself of a lower premium rate, but only after the new insurer promised to cover all employees then covered under the county's old plan. The insurers were changed on February 1, 1961. The deceased employee in that case entered the hospital on January 14, 1961, and died on February 2, 1961. The policy, like the Continental policy in this case, included a standard 'actively at work' provision which the company attempted to use as a bar to the decedent's beneficiary's recovery. The Supreme Court of South Carolina said, in holding that the insurance company could not impose such a condition,

'Under the undisputed evidence, *the appellant was clearly estopped from relying upon the "actively at work" clause contained in both the application and the subsequently delivered policy.* The proposal submitted by Thornton [the insurance company's representative] to Florence County was approved by the appellant and there is no question before us as to the authority of Thornton in the premises. Thornton, in good faith, represented to the county that all employees would be immediately covered from the date of the issuance of the policy, which representation was, in good faith, acted upon by Florence County to the detriment of its employees, Mrs. Spencer in particular, when in reliance upon the representations, the coverage in existence was allowed to expire, on the assurance that the new coverage would fully and immediately replace it.' (Emphasis supplied)." 93 Idaho at 352–53, 461 P.2d at 247–48 (footnote omitted).

In *Martin v. Argonaut, supra,* this Court upheld the trial court's determination that the agent there *had the authority to bind the company to the renewal agreement notwithstanding a general non-waiver policy provision.* 91 Idaho at 893, 434 P.2d at 111. Both *Lewis* and *Martin* relied on *Huppert v. Wolford,* 91 Idaho 249, 420 P.2d 11 (1966). In *Martin* this Court noted from *Huppert:*

"[T]he trial court determined, and such finding is supported by competent evidence, that Wolford did not inform Vloedman that he lacked the authority to provide immediate coverage on the logging truck, and no contention is made that Vloedman should have known Wolford lacked such authority." 91 Idaho at 891, 434 P.2d at 109.

In *Lewis* this Court noted from *Huppert:* "In *Collard v. Universal Automobile Insurance Company* [55 Idaho 560, 45 P.2d 288 (1935)] a provision in an auto accident policy which expressly stated that the contract was void if ownership changed was held to have been waived by the gratuitous declaration of the company's agent, and the company was held liable when the new owner of the car was involved in an accident while on a trip which he took in reliance on the agent's statements. These holdings have recently been reaffirmed in *Huppert v. Wolford* [supra]. In that case a representative of an insurance company promised a truck driver that he would become insured for an indeterminate period from the time that he signed an application. The printed application form, however, expressly limited the binder period to fifteen days. The promise made by the company's representative was held to have estopped the company from barring recovery from it for damages arising out of an accident which had involved the insured truck and which had occurred more than fifteen days after the application had been signed. *Huppert,* on its facts, is a much stronger case from the insurance company's standpoint than is this one. In that case the provision which the company sought to raise in

defense was on a form actually signed by the insured contemporaneously with the parole promise of the insurance agent. In this case Continental is attempting to impose a provision in a printed form which was simply delivered to the county after an agreement had been reached, and which was at variance with that prior agreement." *Lewis,* 93 Idaho at 351–52, 461 P.2d at 246–47 (footnotes omitted).

The question on the estoppel theory is not whether the policy provisions are or are not ambiguous, but whether the company defendant is even entitled to resort to that language. The given instruction informed the jury that the insured's reliance must be that of a reasonable person. This was adequate. Jurors are selected in the first place because they are thought to be reasonable, and presently at least, I cannot see that there was any error, in not instructing the jury as to how they should decide such a proposition. "Reasonable" in and of itself is generally recognized as a word of common understanding.

For certain there was no error in not giving defendant's requested Instruction No. 20, which on cursory examination is found to be couched in language which is more aptly used in fraud and deceit actions—not estoppel.

The opinion authored by Justice Huntley has much good to be said for it. Commendably he attempts to straighten out a difficult area of the law—an area which needs to be straightened out. If I had the controlling vote, the Court would sit on this egg a bit longer and hopefully hatch out an opinion which does clarify the law and commands a unanimous vote. Presently there are portions of the majority opinion with which I do not agree. One in particular is the statement couched in the double negative, and speculative as well, that "It is certainly not the law in Idaho that an insured has no obligation to read his policy, and may with confidence rely on subjective impressions he may have obtained in talking with an agent prior to entering into an insurance contract." Such statement confuses direct statements of an agent with the hearer's impressions. I see no relevance here in that rather ambiguous statement, and do not understand either that it is the law in Idaho that an insured is obligated to read his policy—which assumes that he will understand what he reads. Buying insurance is very often like buying any commodity. The purchaser makes known what he wants, pays his money, and rightfully assumes that the finely worded package which he receives is what he bargained for.

Another problem with the opinion of Justice Huntley is the supposition entered into after stating the principle of *Lewis,* i.e., "supposing," etc., "it is therefore arguable whether the Baldwins were left 'unprotected'" and "it is doubtful they could have obtained the type of coverage they hoped to receive anywhere in the industry."

Turning to the separate opinion of Justice Shepard, I submit my belief that the *Moss* case has little if any bearing on this case. As to the cross-appeal, the trial court did err in reducing the jury's verdict assessing punitive damages.

As stated above, my first vote is that this Court as a collegial group retain the case in an effort to achieve unanimity. That failing, on the main appeal, I vote to affirm on the judgment for compensatory damages and, on the cross-appeal, to reinstate the punitive damages.