509 A.2d 1217

## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

v.

### Jackson BULLOCK, et al.

No. 1281, Sept. Term, 1985.

Court of Special Appeals of Maryland.

June 6, 1986.

**22**

Kevin J. McCarthy (Charles E. Gallagher, Jr. and O'Malley, Miles, McCarthy & Harrell, on brief), Upper Marlboro, for appellant.

Barry J. Dalnekoff (Joel L. Katz, Mark E. Mason and Katz & Dalnekoff, P.A. on brief), Annapolis, for appellee, Bullock.

Frank Collins (Oren D. Saltzman and Jay S. Engerman, on brief), Baltimore, for appellees, Queen and Dunscomb.

Argued before MOYLAN, WILNER and BISHOP, JJ.

WILNER, Judge.

Jackson Bullock was a claims adjustor employed by the Washington Metropolitan Area Transit Authority (WMATA). On the evening of September 10, 1982, while driving a car owned by WMATA on a purely personal errand, Mr. Bullock struck and injured two pedestrians, Regina Queen

and Quantonia Discomb. Ms. Queen and Ms. Discomb filed claims against Bullock and WMATA.

WMATA, which self-insures its vehicles, acknowledged the claims [1] and assigned them to one of its in-house adjustors, Robert Seabald, to handle. Mr. Seabald proceeded, for about 18 months, to receive information from the claimants' counsel and to discuss various aspects of the case with him. At no time during that period did Mr. Seabald suggest to counsel that there was a problem as to underlying coverage. In March, 1984, upon review of the claims by WMATA's acting claims manager, by an "outside" consultant, and by counsel, WMATA concluded that, because Bullock had been instructed not to use the car for personal errands, his use of it at the time of the accident was non-permissive and, as a result, there was no insurance coverage. WMATA then filed this declaratory judgment action in the Circuit Court for Anne Arundel County, seeking a declaration that Bullock was not acting as its agent or employee, that his use of the car was non-permissive, and that WMATA was not responsible for his conduct. Bullock, Queen, and Discomb denied that Bullock's use was non-permissive and asserted further that, by reason of laches, estoppel, and waiver, WMATA was precluded from denying that Bullock's use of the vehicle was permissive. Bullock, indeed, filed a counterclaim in which he asked the court to declare affirmatively that WMATA *was* obligated to defend the Queen/Discomb claims.

After a non-jury trial, the court ruled against WMATA on a number of bases, each of which is challenged in this appeal.

### (1) *Status of the Parties—Underlying Facts*

WMATA is a regional, quasi-governmental entity created by interstate compact to develop and operate a mass transit

---

1. Ms. Queen's claim was filed October 7, 1982. It is not clear when Ms. Discomb's claim was filed. The early correspondence shows only Ms. Queen as the claimant, but no one disputes Ms. Discomb's status as a claimant.

system in the District of Columbia and its Maryland and Virginia suburbs. *See* Md.Code Ann.Transp. art., § 10–204; also 1985–86 Md.Manual, p. 418. The compact provides, in ¶ 80, that WMATA is liable "for its torts and those of its directors, officers, employees and agents committed in the conduct of any proprietary function" and that "[t]he exclusive remedy for such ... torts for which the Authority shall be liable ... shall be by suit against the Authority." Paragraph 72 of the compact authorizes WMATA to self-insure "against liability for injury to persons or property" and provides that "[s]uch insurance coverage shall be in such form and amount as the board may determine...." [2] Pursuant to that authority, WMATA apparently elected to self-insure its vehicles in the District of Columbia.[3]

WMATA concedes that it owned the vehicle driven by Bullock, that Bullock was its employee, and that he had permission to use the vehicle at work and to commute to and from work. The thrust of its argument is that Bullock was on a personal errand at the time, that he not only did not have permission to use the car for such a purpose but was expressly forbidden to do so, that that restriction is not against public policy, and that it has done nothing to preclude it from asserting the defense of non-permissive use.

Bullock, for his part, concedes that he was on a personal errand and that, as a result, he was not acting within the scope of his employment at the time of the accident. His defense is based on the notion that his personal use of the vehicle was a permissive one and that WMATA *is* precluded from contending otherwise.

It is undisputed that, when Bullock began employment with WMATA in 1972, he was given a company car that he

---

**2.** WMATA is governed by a board of six directors. *See* § 10–204, ¶ 5.

**3.** WMATA's vehicles, including the one driven by Bullock, are registered in the District. The D.C. Motor Vehicle Safety Responsibility Act (D.C.Code, § 40–401, *et seq.*) permits owners to self-insure their vehicles under certain circumstances. *See,* in particular, §§ 40–478 and 40–457.

could use for both business and personal use. The unrestricted use of the car was regarded by him, and by the other adjustors who had them, as part of their compensation. Periodically, WMATA announced policies restricting the personal use of company vehicles, but those policies were not effectively enforced against claims adjustors.[4] In February, 1982, WMATA decided to discontinue the assignment of cars on a "take-home basis" altogether, which would have precluded their use even for commuting. This new policy was announced in a memorandum of February 16, 1982, which, among other things, repeated the prohibition against using company cars "for other than official purposes."

Regarding this new policy as an improper modification of their unwritten (and, from what we were told at oral argument, at-will) employment agreements, the adjustors protested. On March 10, 1982, ten of them, including Bullock, submitted a proposal "to lay to rest once and for all this demoralizing problem . . . ." They offered two alternatives: (1) to "grandfather" the existing adjustors and permit them "the continued unrestricted and unrestrained use of a WMATA vehicle under the same conditions said employees have utilized and enjoyed since their employment with WMATA began," or (2) the adjustors would receive an immediate full grade step promotion retroactive to January 1, 1982, they would surrender their company cars on January 1, 1983, upon surrender they would receive a bonus of $3,000 plus free maintenance, fuel, insurance, and parking for the cars they bought to replace the company vehicles, and, as their replacement vehicles wore out, they would

---

4. A 1979 memorandum from the then-general manager allowed vehicles to be assigned on a "take-home basis" with the approval of the general manager or an assistant general manager but warned that "[t]he use of [WMATA] vehicles for other than official purposes is prohibited. Such use shall be cause for revocation of vehicle assignment or use and disciplinary action of the employee involved." That was repeated in a 1980 memorandum. But the personal use continued, and no sanctions were ever imposed.

receive an additional $3,000 toward the cost of a second replacement vehicle.

Management was apparently unwilling to accede to either of those proposals. William Chadwick, purportedly acting on behalf of himself and the nine other adjustors, did, however, negotiate an agreement with Delmer Ison, the acting director of the claims department, under which (1) the ten adjustors would receive a full grade step promotion effective April 16, 1982, (2) they would retain possession of the vehicles assigned to them until December 31, 1982, at which time the vehicles would be surrendered, and (3) the adjustors agreed "not to use the WMATA vehicle assigned to each of them for personal use." Although a senior official of WMATA expressed reservations about this agreement, WMATA fully lived up to its obligations under it. The adjustors, including Bullock, got their immediate raise and, with one exception, they were allowed to keep their vehicles until December 31, 1982. The exception was that, when Mr. Ison learned that Bullock was on a personal errand at the time of the accident, he took the car away from him immediately.

The memorandum of this agreement was signed only by Chadwick, and Bullock never affirmatively acknowledged that he was bound by it. The evidence was uncontradicted, however, that Bullock knew of the agreement, that he accepted the benefits of it, that he never complained about it, and that he never denied being bound by it. There was also some evidence that the interim restriction on personal use was not strictly adhered to, that some of the adjustors continued to use the cars for uses that might be regarded as personal. There was no evidence that anyone in management above Mr. Chadwick, who, though part of the group of 10, was a claims supervisor, was aware of this continued use or in any way approved of it.

In further defense of his position as to permissive use, Bullock presented as an expert witness Edward J. Birrane, Jr., a former Maryland Insurance Commissioner. Over

objection, Mr. Birrane was allowed to testify, based on a telephone conversation with a former Motor Vehicle Administrator, that that former Administrator would "not accept a filing from a self insurer whose coverage was less broad than that required by the insurance commissioner of an insurance company" and that

"for a self insured to effect an agreement such as the one that I have seen between WMATA and these particular adjusters is and ought to be contrary to the public policy of the State of Maryland, whose announced public policy is to make sure that any victim or person who suffers loss, damage, through the negligent operation of an automobile ought to be able to show that they are indemnified and this agreement seeks in specific reference as respects the countermanding of the allowance of personal use to deny indemnification which is the specific public policy of Maryland and in my opinion is an open invitation to fraud."

On this evidence, the court announced findings that: (1) the April 8 change of policy was not binding on Bullock because he never "agreed" to it, (2) Bullock therefore had continued permission to use the car assigned to him for personal use, (3) he was, as a result, "operating [the car] with permission of WMATA even though he was using it for his own personal use at that time," (4) for a change in policy restricting personal use to be effective, notice of the change must be given not only to the affected employee but also to "potential claimants," (5) it would be against public policy to allow WMATA, as a self-insurer, to decline coverage "because of some alleged agreement between the employer and employee," and (6) "because of [its] long continued non-enforcement of the so-called company policy, [WMATA] would be estopped from denying coverage to Mr. Bullock for his alleged personal use at the time of this accident."

These findings were translated into formal declaratory judgments. By order dated September 11, 1985, the court declared that Bullock was an employee of WMATA at the

time of the accident, that Bullock was operating the vehicle "with the permission of WMATA," that WMATA "is estopped from denying that [Bullock] had permission and consent to operate the said vehicle," that Bullock's "use of the said vehicle was within the scope of that permission," that WMATA "waived" any claim that Bullock's particular use of the vehicle was non-permissive, and that WMATA is therefore obligated to defend the claims.

### (2) *The Issues—Introduction*

As we observed earlier, WMATA challenges each of the court's findings and conclusions. To provide a proper context in which to consider the issues before us, we start with the fact that Bullock, though an employee of WMATA, clearly was not acting within the scope of his employment when the accident occurred. He conceded the point, both in the trial court through his answers to WMATA's request for admissions and in this Court. *Compare,* however, D.C. Code, § 40–408; *but see Gaither v. Myers,* 404 F.2d 216 (D.C.Cir.1968). Accordingly, WMATA would have no derivative liability as Bullock's employer; its liability can rest only upon its status as an insurer of the vehicle.

The issue of WMATA's liability as an insurer is complicated by the fact, and the somewhat unclear nature, of its self-insurance. As noted, the compact (¶ 72) authorizes WMATA to self-insure in such form and amount as its board of directors determines, but the record is bare of any evidence as to what, if anything, the board determined. WMATA eventually obtained from the District of Columbia a Self-Insurer Certificate simply attesting that WMATA "has qualified as a Self-Insurer for the payment of benefits for personal injury protection benefits, bodily injury liability, property damage liability and uninsured motorist coverage, arising out of all of the operations now conducted by means of Motor Vehicles *within the District of Columbia*

...." (Emphasis added.)[5] The certificate does not set forth the nature, scope, or extent of the coverage provided within the District, and gives no indication at all of what, if any, coverage is afforded for accidents occurring outside the District. Although D.C.Code, § 40–453 requires the certificate to be "supplemented by an agreement by the self-insurer that, with respect to accidents occurring while the certificate is in force, he will pay the amounts that an insurer would have been obliged to pay under an owner's motor vehicle liability policy if it had issued such a policy to said self-insurer," no such agreement is in the record before us.[6] Nor is there any indication whether WMATA was obliged to comply with Maryland's required security laws or whether it had done anything to effect such compliance.

The accident in question occurred in Maryland. We therefore have a situation in which (1) unlike most instances, there is no policy language to construe, (2) the only evidence of the nature and extent of coverage is that provided in the D.C.Code which, facially at least, appears to have no application outside the District, and (3) there is no indication at all of what coverage is afforded for vehicles such as the one operated by Bullock, registered in the District but operated in Maryland. *Compare Hines v. Potomac Elec. Power Co.*, 305 Md. 369, 504 A.2d 632 (1986). In the end, we shall conclude that this case cannot properly be decided on this record, and we shall therefore vacate the judgments entered below and remand the case for further proceedings. We shall, however, for the guidance of the

---

**5.** The certificates actually in the record cover the years 1983 and 1984. There is no certificate in the record covering 1982. We were told at oral argument that a certificate was not required in 1982, although we can find no basis in the D.C. Code for such a statement.

**6.** Counsel for the claimants expressly represented to the Court at oral argument that the requirement of § 40–453 was not in the D.C. law in 1982. Our research shows that it was, and that counsel's representation simply is not correct. Section 40–453 has been part of the D.C. law since 1954. We do not appreciate such affirmative misstatements.

court on remand, address the findings heretofore made by the court.

### (3) *Non-Permissive Use—Public Policy*

The trial court rejected WMATA's position essentially on three bases: (1) because Bullock had not "agreed" to the restriction on personal use, he was not bound by it; (2) it would be against public policy for WMATA to withdraw coverage for personal use without giving some kind of effective public notice to "potential claimants" that it was doing so; and (3) because it had not effectively enforced its ban on personal use, WMATA was estopped from asserting that ban as a defense. On the record before us, we disagree with each of those findings and conclusions. We begin with the question of public policy.

To this point, it has not been regarded as against public policy in this State for an insurer to disclaim or deny coverage when an insured vehicle is being used by someone other than the "named insured" without the permission or beyond the scope of the permission of the "named insured." As the Court pointed out in *National Grange Mut. Ins. v. Pinkney*, 284 Md. 694, 399 A.2d 877 (1979), coverage of persons other than the named insured (or members of his household) arises only from what is generally referred to as an "omnibus clause" in an insurance policy, and "there is no provision in any Maryland statute to which we have been referred, or which we have found in our research, which requires an omnibus clause to appear in any motor vehicle liability insurance policy." *Id.*, at 704–05, 399 A.2d 877.[7]

---

7. We have found nothing in the law or in the regulations of the Insurance Commissioner to suggest that, as a general proposition, that statement, if accurate in 1979, is not still accurate. It is certainly arguable, however—and we think meritoriously so—that where, as here, the vehicles are owned by a corporate-type entity, which has acquired them specifically for use by its employees, i.e., persons other than the named insured, public policy would indeed demand the kind of extended coverage normally provided in an omnibus clause. To hold otherwise—to allow such entities to exclude from coverage even permissive use by their employees—would be wholly inconsistent with the State's compulsory insurance law. *See Jennings v. Government*

*National Grange* also involved a company vehicle that an employee, Pinkney, was permitted to drive. The vehicle was insured under a policy providing coverage to the named insured and any other person while using the vehicle "with the permission of the named insured, provided his actual operation [was] within the scope of such permission...." *Id.*, 696, 399 A.2d 877. There was a dispute of fact as to whether Pinkney had permission to use the vehicle for personal use: the company maintained that Pinkney's after-hours use was restricted to commuting directly to and from work and that he was never to carry more than one passenger; Pinkney stated that he was given unrestricted use. The accident occurred at 3:22 a.m.—long after his 5:00 p.m. quitting time—while Pinkney was carrying seven passengers. Notwithstanding the factual dispute as to the restriction on personal use, the circuit court granted summary judgment against the insurer and held it liable.

The Court of Appeals noted that three alternative rules of construction had developed with respect to permissive use cases. The most expansive of these, sometimes known as the "liberal," or "initial permission," or "hell or high water" rule holds that

> "if the vehicle was originally entrusted by the named insured, or one having proper authority to give permission, to the person operating it at the time of the accident, then despite hell or high water, such operation is considered to be within the scope of the permission granted, regardless of how grossly the terms of the original bailment may have been violated."

*National Grange Mut. Ins.*, 284 Md. at 698, 399 A.2d 877, quoting 6C Appleman, *Insurance Law and Practice* § 4367 (Buckley ed. 1979). A second rule, denoted the "conversion" rule, recognizes that a particular use can so exceed

---

*Employees Ins.*, 302 Md. 352, 488 A.2d 166 (1985). We shall assume, therefore, that the Court's statement to which this note refers was not intended to apply to this kind of case, and that extended coverage to employees, at least while using company vehicles within the scope of permission granted by the company, is required in Maryland.

the scope of initial permission as to become non-permissive but requires that the departure be such as would cause the user to be liable to the owner in an action for conversion. The third rule, considered to be "an intermediate position between the two more extreme rules," is known as the "minor deviation" rule. *National Grange,* 284 Md. at 699, 399 A.2d 877, quoting 12 G. Couch, *Cyclopedia of Insurance Law* § 45:462 (2d ed. R. Anderson 1964). It regards "minor deviations" as still being within the scope of permissive use.

The *National Grange* Court observed that the Court had previously rejected the "liberal" rule and saw no public policy reason to change that view. In the end, it took an almost unique approach, rejecting all three rules and opting instead to construe, on a case-by-case basis, the particular wording of the omnibus clause at issue. At 706 (of 284 Md., 399 A.2d 877), it made the point:

> "We note specifically that all omnibus clauses do not contain the same language. Because these clauses are part of contracts, it follows that they must be interpreted pursuant to their terms on a contract by contract or case by case basis, and not by sweeping language saying that regardless of the exact provisions of the contract we shall interpret all similar, but not identical, contracts alike."

Because the Court rejected the "liberal" rule, it concluded that the dispute as to whether Pinkney had permission to use the vehicle for personal errands was crucial, and that the circuit court therefore erred in deciding the case on summary judgment. Its parting message, at 707, 399 A.2d 877, was as follows:

> "If the trier of fact concludes after listening to all of the testimony that the actual operation of the vehicle was within the scope of the permission granted, then National Grange will be obliged to defend. Obviously, if the trier of fact believes that such actual operation was not within the scope of the permission granted, then National Grange is not obligated under the omnibus clause."

*National Grange,* it seems to us, is flatly inconsistent with the notion that a permissive use restriction in an omnibus clause is in violation of public policy. Those courts that have decided to preclude permissive use restrictions as a matter of public policy have generally done so by adopting the "liberal" rule of construction, for indeed that rule rests clearly upon that very notion of public policy. In addition to 6C Appleman, *supra,* § 4367, quoted in *National Grange, see Milbank Mut. Ins. Co. v. U.S. Fidelity,* 332 N.W.2d 160, 166 (Minn.1983); *compare American Family Ins. Group v. Howe,* 584 F.Supp. 369 (D.S.Dak.1984); *Travelers Indemnity Company v. Watkins,* 209 So.2d 630 (Miss.1968). Yet the Court rejected that rule and held that if Pinkney was indeed told not to use the vehicle for personal errands, there would be no coverage.

A similar conclusion had earlier been reached in *Goodwin v. Home Indemnity Co.,* 255 Md. 364, 258 A.2d 220 (1969), *Cohen v. Am. Home Assurance Co.,* 255 Md. 334, 258 A.2d 225 (1969), and *Federal Ins. Co. v. Allstate Ins. Co.,* 275 Md. 460, 341 A.2d 399 (1975), and it was confirmed subsequently in *Bond v. Pennsylvania Nat'l Mut.,* 289 Md. 379, 424 A.2d 765 (1981).

*Bond* involved an omnibus clause extending coverage to persons using the insured vehicle "with the permission of the named insured, provided his actual operation ... thereof is within the scope of such permission." The owner had given her daughter general use of the car, but had expressly forbidden the daughter to allow anyone else to drive it. In disregard of that instruction, the daughter allowed a friend to drive the car. The friend drove negligently, hit a pole, and injured a passenger. Affirming the denial of coverage, the Court held, at 386–87:

> "Unless some statute, regulation having the effect of a statute, or public policy is violated, (and none is suggested by the parties here) insurance, being contractual, is measured by the contract terms.[2] In this case the terms of the insurance agreement clearly require that the operator have permission of the named insured to drive the

vehicle, and if that person does not, there is no coverage for her under this policy. Put another way—when the use being made of the automobile is operation of it, this insurance policy in unambiguous language specifies that the person operating the vehicle enjoy permission to do so from the named insured. See *National Grange Mut. Ins. v. Pinkney, supra.*"

In the footnote to the first sentence of that passage, the Court observed that the appellants had not urged that the omnibus clause was void as against public or legislative policy and that the Court therefore did not consider that issue. Whether the Court was merely stating a truism or was using that gratuitous footnote to suggest something more is not clear. In *Jennings v. Government Employees Ins.*, 302 Md. 352, 488 A.2d 166 (1985), the Court dropped another pregnant footnote that may shed some light on the matter.

In *Jennings,* the Court held that the "household exclusion" clause—the provision excluding from liability coverage injuries sustained by the named insured or members of his family living in his household—was against public policy. The thrust of the decision, supported by decisions in other States, was that the "exclusion of a large category of claimants, suffering bodily injury from accidents, is not consistent with [the mandatory insurance law]." If "any and all exclusions from this required liability coverage are valid as long as they are not expressly prohibited by statute," the Court continued, "the purpose of compulsory automobile liability insurance could be frustrated to a significant extent." *Id.*, 360, 488 A.2d 166 (footnote omitted).

It was in a footnote to that last statement that the Court considered the appellant's argument that the rejection of the "liberal" rule in *National Grange Mut. Ins. v. Pinkney* stood for the proposition "that adoption of mandatory liability insurance does not alter prior Maryland case law regarding liability insurance." That, said the Court,

"is an overbroad interpretation of *Pinkney*. The instant case deals with a policy exclusion that would exclude classes of people. For example, family members of the named insured's household as well as the named insured are precluded from recovery. The person qua person is precluded from recovery. *Pinkney*, on the other hand, dealt with an exclusion based upon an action taken by a person—in that case, acquiring permission, or failing to do so, to drive the vehicle. In *Pinkney*, this Court stated 'that the public policy of this State as enunciated by the General Assembly is that there should be liability coverage ... for any one person....' 284 Md. at 704, 399 A.2d 877."

*Jennings*, 302 Md. at 360–61 n. 9, 488 A.2d 166.

This distinction suggests to us that the Court has not changed the view expressed in *National Grange*, and that the permissive use limitation, involving "an action taken by a person" rather than the exclusion of a whole class of persons, is not against public policy.

This view, we think, is generally supported by decisions in other States. Unless clearly operating under the "liberal" rule, the law seems to be as stated in Annot., *Automobile liability insurance: permission or consent to employee's use of car within meaning of omnibus coverage clause,* 5 A.L.R. 2d 600, 651 (1949):

"Where the employer has expressly forbidden his employee to use the employer's automobile for his own personal purposes, such use of the automobile by the employee in violation of orders is not deemed to be one with the permission of the employer within the meaning of the omnibus clause of the liability insurance policy."

*See also Boyd v. Liberty Mutual Insurance Company*, 232 F.2d 364 (D.C.Cir.1956); *Ditmyer v. American Liberty Insurance Company*, 117 Ga.App. 512, 160 S.E.2d 844 (1968); *McKee v. Travelers Insurance Company*, 315 S.W.2d 852 (Mo.App.1958); *Olgin v. Employers Mut. Casu-*

*alty Co.,* 228 S.W.2d 552 (Tex.Civ.App.1950); and 6C Appleman, *supra,* § 4370.

■ Absent some further word from the Court of Appeals, then, we conclude that the exclusion from coverage of non-permissive use or use beyond the scope of the owner's permission is not against public policy in Maryland. It follows that (1) an insurer, including a self-insurer, may exclude coverage for non-permissive use, (2) an employer, as the owner of the vehicle and the named insured, as self-insurer or under a policy, may permit an employee to use the vehicle generally but expressly forbid him from using it for personal errands, and (3) if, in violation of that limitation, the employee indeed uses the vehicle for a personal errand, the use may be regarded as non-permissive, thereby excluding it from coverage under a standard-type of omnibus clause.

■ We know of no provision of Maryland law requiring an insurer, including a self-insurer, to give notice to "potential claimants"—which, essentially, means the entire world—of such a restriction. Indeed, it is hard to imagine how any such kind of notice could be effectively given.

#### (4) *Actual Or Implied Permissive Use*

The court's conclusion that Bullock in fact had permission to use the car for personal errands was based on its finding that Bullock never "agreed" to the restriction on personal use laid down in the April, 1982 memorandum, and that he therefore continued to enjoy the rights he had before that memorandum became effective. Its further conclusion that Bullock had some sort of "implied" permission to use the car for personal errands was based on its finding of "long continued non-enforcement" of the restriction. To some extent, it seems, that latter finding also underlay the court's determination that WMATA was estopped from

denying permissive use or had waived its right to that defense.[8]

We acknowledge that, to a large extent, these findings are factual ones to which, under Md. Rule 1086, we are required to give great deference. We find, however, that there is no substantial evidence in support of them, and, in some measure they rest on an incorrect interpretation of law.

■ With respect to any actual permission, we are hard-pressed to find any support for the notion that Bullock did not agree to the compromise reached in April, 1982. As we observed earlier, he knew of the agreement and, even though he did not sign the memorandum of it, he accepted without protest all of its benefits, and he never said or did anything to suggest that he was not bound by it. He even acknowledged an awareness that he was not supposed to use the WMATA vehicle for personal errands. Mere silence—a mere refusal to admit being a party to it—cannot, under these circumstances, support a finding that he was not bound by it. *See Porter v. General Boiler Casing Co.,* 284 Md. 402, 396 A.2d 1090 (1979), where the Court held that acceptance of a contract/offer "can be accomplished by acts as well as words; no formal acceptance is required," *id.,* 409, and that:

> "Silence can also operate as acceptance. Where 'services are rendered under such circumstances that the party benefited thereby knows the terms on which they are being offered [, i]f he receives the benefit of the services in silence, when he had a reasonable opportunity to express his rejection of the offer, he is assenting to the terms proposed and thus accepts the offer.' "

*Id.,* 412, quoting in part from Corbin, *Contracts,* § 75.

■ Quite apart from whether Bullock did or did not assent to the April, 1982 compromise, the fact is that his

---

**8.** It is not entirely clear whether the waiver-estoppel finding was based on this so-called "non-enforcement" policy or on the fact that WMATA waited 18 months to deny coverage. We shall address the first of these theories here and consider the second in part (5).

assent or non-assent is simply immaterial. As the owner, WMATA was empowered to place whatever limitations it chose upon Bullock's use of the vehicle. If, as urged here, such a limitation amounted to a breach of Bullock's employment agreement, he might have some remedy under WMATA's personnel policies or under applicable labor laws. Putting aside the at-will nature of his employment, he might even have an action for breach of contract. But he may not, simply by ignoring the limitation, create insurance coverage where none otherwise exists.

■ With respect to the "implied" permission—the so-called "non-enforcement" of the restriction—the evidence showed that, at least after April, 1982, WMATA definitely and unambiguously precluded the personal use of these vehicles. The fact that some of the adjustors continued, on some occasions, to use the vehicles to attend company-sponsored picnics or bowling league functions,[9] or even for other, more clearly personal uses, does not render the company policy void or ineffective. As we observed earlier, there was no evidence that anyone in the WMATA management above Mr. Chadwick knew of, much less acquiesced in, any such use. Indeed, as soon as Mr. Ison discovered the violation by Bullock, he enforced the policy by taking away the car and formally reprimanding Bullock. We thus have uncontroverted evidence of a clear company policy forbidding personal use, and, as noted in *Bond v. Pennsylvania Nat'l Mut.*, 289 Md. 379, 385, 424 A.2d 765 (1981), "you cannot imply something in the face of an express statement to the contrary."

---

**9.** Most of the evidence offered to show continued personal use of the vehicles after April, 1982, had to do with attendance at these functions. It is not at all clear that using the cars to attend these company-sponsored events constituted a forbidden personal use. *Cf. Coats & Clark's Sales v. Stewart*, 39 Md.App. 10, 383 A.2d 67 (1978), discussing attendance at such events in terms of workmen's compensation coverage.

### (5) *Estoppel/Waiver*

To the extent that the court's findings of waiver and estoppel rested on the alleged "non-enforcement" by WMATA, i.e., the alleged continued use of the cars for personal errands, they have no greater validity than the finding of implied permission, for the reasons expressed in part (4). To the extent they rest upon the handling of the claims by WMATA's adjustor—the delay in raising the question of coverage—they suffer from another weakness.

Appleman, in Volume 16C, § 9361 states:

"While an insurer may waive or be estopped from relying on a defense by its unreasonable delay in notifying the insured that it intends to rely on such defense, it will not be barred where such delay is not unreasonable, or the insured was not injured by the delay. *Nor would the insurer generally be estopped, by its failure to deny liability, from denying the existence of coverage.*"

(Emphasis added; footnotes omitted.)

This last concept has been applied in Maryland. It rests on the "rule of law existing in this State that '[i]nsurance coverage cannot be established by waiver.'" *St. Paul Fire & Mar. Ins. v. Molloy,* 291 Md. 139, 146–47 n. 4, 433 A.2d 1135 (1981), quoting in part from *Neuman v. Travelers Indemnity Co.,* 271 Md. 636, 319 A.2d 522 (1974). We examined that concept in *Insurance Co. of N. Amer. v. Coffman,* 52 Md.App. 732, 451 A.2d 952 (1982). Citing *St. Paul Fire & Mar. Ins.* and *Neuman,* we discerned

"a distinction between defenses founded upon lack of basic coverage and those arising from the failure of the claimant to satisfy some 'technical' condition subsequent. The former, it is apparent, may *not* be waived merely by the company's failure to specify them in its initial response to the claim, *for the effect of that would be to expand the policy to create a risk not intended to be undertaken by the company.*"

*Coffman,* 52 Md.App. at 742–43, 451 A.2d 952 (emphasis added). *Cf. Zappone v. Home Ins. Co.,* 80 A.D.2d 661, 436

N.Y.S.2d 402 (1981), *aff'd*, 55 N.Y.2d 131, 447 N.Y.S.2d 131, 432 N.E.2d 783 (1982).

■ The defense at issue here goes to basic coverage, not to some pre-condition to asserting the claim. The mere failure of the adjustor to raise the defense therefore cannot, by waiver or estoppel, create a coverage that would otherwise not exist.

### (6) *Conclusion*

For the reasons stated in Parts (3), (4), and (5) of this Opinion, we conclude that the trial court erred in the declaratory findings that it made. For the reasons stated in Part (2), however, we believe that the case should be remanded pursuant to Md. Rule 1071 for further proceedings. The court should examine any agreement filed by WMATA pursuant to D.C. Code, § 40–453 along with any directive of the WMATA board pursuant to ¶ 72 of the compact indicating the "form and amount" of coverage. It should also explore any evidence as to how WMATA may have handled any other claims (if there were any other claims) arising from the personal use of company vehicles by adjustors after April, 1982. All of this should be examined in light of the financial responsibility laws of the District and of Maryland, in order that the precise nature of the coverage undertaken by WMATA as a self-insurer can be ascertained. *See Hines v. Potomac Elec. Power Co.,* 305 Md. 369, 504 A.2d 632 (1986); *Southern Home Ins. Co. v. Burdette's Leasing,* 268 S.C. 472, 234 S.E.2d 870 (1977); *Comorote v. Massey,* 110 N.J.Super. 124, 264 A.2d 478 (1970); 6B Appleman, *supra,* § 4298. That, then, will determine whether, and to what extent, WMATA is liable on the Queen/Discomb claims.

We also suggest, in parting, that the General Assembly may wish to consider whether there is a need for legislation addressing the problem of self-insured vehicles registered in other jurisdictions but operated on a regular basis in Maryland.

JUDGMENTS VACATED; CASE REMANDED TO CIR-
CUIT COURT FOR ANNE ARUNDEL COUNTY FOR
FURTHER PROCEEDINGS; APPELLEES TO PAY THE
COSTS.